# MOBIL OIL EXPLORATION & PRODUCING SOUTHEAST, INC. *v.* UNITED STATES

No. 99–244.   Argued March 22, 2000—Decided June 26, 2000*

---

*Together with No. 99–253, *Marathon Oil Co.* v. *United States,* also on certiorari to the same court.

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, THOMAS, and GINS-BURG, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 624.

*Carter G. Phillips* argued the cause for petitioners in both cases. With him on the briefs for petitioner Marathon Oil Co. were *Richard D. Bernstein, Griffith L. Green, Michael S. Lee,* and *Richard L. Horstman. E. Edward Bruce* and *Steven J. Rosenbaum* filed briefs for petitioner Mobil Oil Exploration & Producing Southeast, Inc.

*Kent L. Jones* argued the cause for the United States in both cases. With him on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Ogden, Dep-*

*uty Solicitor General Wallace, David M. Cohen, Douglas N. Letter, Thomas M. Bondy,* and *Mark A. Melnick.*†

JUSTICE BREYER delivered the opinion of the Court.

Two oil companies, petitioners here, seek restitution of $156 million they paid the Government in return for lease contracts giving them rights to explore for and develop oil off the North Carolina coast. The rights were not absolute, but were conditioned on the companies' obtaining a set of further governmental permissions. The companies claim that the Government repudiated the contracts when it denied them certain elements of the permission-seeking opportunities that the contracts had promised. We agree that the Government broke its promise; it repudiated the contracts; and it must give the companies their money back.

## I

### A

A description at the outset of the few basic contract law principles applicable to this action will help the reader understand the significance of the complex factual circumstances that follow. "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *United States* v. *Winstar Corp.,* 518 U. S. 839,

---

†*J. Berry St. John, Craig Wyman, G. William Frick, David T. Deal,* and *Douglas Morris* filed a brief for the American Petroleum Institute as *amicus curiae* urging reversal.

A brief of *amici curiae* urging affirmance was filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, *Richard M. Frank,* Chief Assistant Attorney General, *J. Matthew Rodriquez,* Senior Assistant Attorney General, and *John A. Saurenman,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Michael F. Easley* of North Carolina, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Charlie Condon* of South Carolina, and *Christine O. Gregoire* of Washington.

895 (1996) (plurality opinion) (internal quotation marks omitted). The Restatement of Contracts reflects many of the principles of contract law that are applicable to this action. As set forth in the Restatement of Contracts, the relevant principles specify that, when one party to a contract repudiates that contract, the other party "is entitled to restitution for any benefit that he has conferred on" the repudiating party "by way of part performance or reliance." Restatement (Second) of Contracts § 373 (1979) (hereinafter Restatement). The Restatement explains that "repudiation" is a "statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach." *Id.;* § 250. And "total breach" is a breach that "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." *Id.,* § 243.

As applied to this action, these principles amount to the following: If the Government said it would break, or did break, an important contractual promise, thereby "substantially impair[ing] the value of the contract[s]" to the companies, *ibid.,* then (unless the companies waived their rights to restitution) the Government must give the companies their money back. And it must do so whether the contracts would, or would not, ultimately have proved financially beneficial to the companies. The Restatement illustrates this point as follows:

> "A contracts to sell a tract of land to B for $100,000. After B has made a part payment of $20,000, A wrongfully refuses to transfer title. B can recover the $20,000 in restitution. The result is the same even if the market price of the land is only $70,000, so that performance would have been disadvantageous to B." *Id.,* § 373, Comment *a*, Illustration 1.

B

In 1981, in return for up-front "bonus" payments to the United States of about $156 million (plus annual rental payments), the companies received 10-year renewable lease contracts with the United States. In these contracts, the United States promised the companies, among other things, that they could explore for oil off the North Carolina coast and develop any oil that they found (subject to further royalty payments) provided that the companies received exploration and development permissions in accordance with various statutes and regulations to which the lease contracts were made "subject." App. to Pet. for Cert. in No. 99–253, pp. 174a–185a.

The statutes and regulations, the terms of which in effect were incorporated into the contracts, made clear that obtaining the necessary permissions might not be an easy matter. In particular, the Outer Continental Shelf Lands Act (OCSLA), 67 Stat. 462, as amended, 43 U. S. C. § 1331 *et seq.* (1994 ed. and Supp. III), and the Coastal Zone Management Act of 1972 (CZMA), 86 Stat. 1280, 16 U. S. C. § 1451 *et seq.*, specify that leaseholding companies wishing to explore and drill must successfully complete the following four procedures.

First, a company must prepare and obtain Department of the Interior approval for a Plan of Exploration (Exploration Plan or Plan). 43 U. S. C. § 1340(c). Interior must approve a submitted Exploration Plan unless it finds, after "consider[ing] available relevant environmental information," § 1346(d), that the proposed exploration

"would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral . . . , to the national security or defense, or to the marine, coastal, or human environment." § 1334(a)(2)(A)(i).

Where approval is warranted, Interior must act quickly—within "thirty days" of the company's submission of a proposed Plan. § 1340(c)(1).

Second, the company must obtain an exploratory well drilling permit. To do so, it must certify (under CZMA) that its Exploration Plan is consistent with the coastal zone management program of each affected State. 16 U. S. C. § 1456(c)(3). If a State objects, the certification fails, unless the Secretary of Commerce overrides the State's objection. If Commerce rules against the State, then Interior may grant the permit. § 1456(c)(3)(A).

Third, where waste discharge into ocean waters is at issue, the company must obtain a National Pollutant Discharge Elimination System permit from the Environmental Protection Agency. 33 U. S. C. §§ 1311(a), 1342(a). It can obtain this permit only if affected States agree that its Exploration Plan is consistent with the state coastal zone management programs or (as just explained) the Secretary of Commerce overrides the state objections. 16 U. S. C. § 1456.

Fourth, if exploration is successful, the company must prepare, and obtain Interior approval for, a Development and Production Plan—a Plan that describes the proposed drilling and related environmental safeguards. 43 U. S. C. § 1351. Again, Interior's approval is conditioned upon certification that the Plan is consistent with state coastal zone management plans—a certification to which States can object, subject to Commerce Department override. § 1351(a)(3).

## C

The events at issue here concern the first two steps of the process just described—Interior's consideration of a submitted Exploration Plan and the companies' submission of the CZMA "consistency certification" necessary to obtain an exploratory well drilling permit. The relevant circumstances are the following:

1. In 1981, the companies and the Government entered into the lease contracts. The companies paid the Government $156 million in up-front cash "bonus" payments.

2. In 1989, the companies, Interior, and North Carolina entered into a memorandum of understanding. In that memorandum, the companies promised that they would submit an initial draft Exploration Plan to North Carolina before they submitted their final Exploration Plan to Interior. Interior promised that it would prepare an environmental report on the initial draft. It also agreed to suspend the companies' annual lease payments (about $250,000 per year) while the companies prepared the initial draft and while any state objections to the companies' CZMA consistency certifications were being worked out, with the life of each lease being extended accordingly.

3. In September 1989, the companies submitted their initial draft Exploration Plan to North Carolina. Ten months later, Interior issued the promised ("informal" presubmission) environmental report, after a review which all parties concede was "extensive and intensive." App. 179 (deposition of David Courtland O'Neal, former Assistant Secretary of the Interior) (agreeing that the review was "the most extensive and intensive" ever "afforded an exploration well in the outer continental shelf (OCS) program"). Interior concluded that the proposed exploration would not "significantly affec[t]" the marine environment or "the quality of the human environment." *Id.*, at 138–140 (U. S. Dept. of Interior Minerals Management Service, Environmental Assessment of Exploration Plan for Manteo Area Block 467 (Sept. 1990)).

4. On August 20, 1990, the companies submitted both their final Exploration Plan and their CZMA "consistency certification" to Interior.

5. Just two days earlier, on August 18, 1990, a new law, the Outer Banks Protection Act (OBPA), § 6003, 104 Stat. 555, had come into effect. That law prohibited the Secre-

tary of the Interior from approving any Exploration Plan or Development and Production Plan or to award any drilling permit until (a) a new OBPA-created Environmental Sciences Review Panel had reported to the Secretary, (b) the Secretary had certified to Congress that he had sufficient information to make these OCSLA-required approval decisions, and (c) Congress had been in session an additional 45 days, but (d) in no event could he issue an approval or permit for the next 13 months (until October 1991). § 6003(c)(3). OBPA also required the Secretary, in his certification, to explain and justify in detail any differences between his own certified conclusions and the new Panel's recommendations. § 6003(c)(3)(A)(ii)(II).

6. About five weeks later, and in light of the new statute, Interior wrote a letter to the Governor of North Carolina with a copy to petitioner Mobil. It said that the final submitted Exploration Plan "is deemed to be approvable in all respects." It added:

> "[W]e are required to approve an Exploration Plan unless it is inconsistent with applicable law or because it would result in serious harm to the environment. Because we have found that Mobil's Plan fully complies with the law and will have only negligible effect on the environment, we are not authorized to disapprove the Plan or require its modification." App. to Pet. for Cert. in No. 99–253, p. 194a (letter from Regional Director Bruce Weetman to the Honorable James G. Martin, Governor of North Carolina, dated Sept. 28, 1996).

But, it noted, the new law, the "Outer Banks Protection Act (OBPA) of 1990 . . . prohibits the approval of any Exploration Plan at this time." It concluded, "because we are currently prohibited from approving it, the Plan will remain on file until the requirements of the OBPA are met." In the meantime a "suspension has been granted to all leases offshore

the State of North Carolina." *Ibid.* See also App. 129–131 (letter from Lawrence H. Ake, Minerals Management Service, to William C. Whittemore, Mobil Exploration & Producing U. S. Inc., dated Sept. 21, 1990 (notice of suspension of leases, citing 30 CFR §250.10(b)(7) (1990) as the basis for the suspensions)).

About 18 months later, the Secretary of the Interior, after receiving the new Panel's report, certified to Congress that he had enough information to consider the companies' Exploration Plan. He added, however, that he would not consider the Plan until he received certain further studies that the new Panel had recommended.

7. In November 1990, North Carolina objected to the companies' CZMA consistency certification on the ground that Mobil had not provided sufficient information about possible environmental impact. A month later, the companies asked the Secretary of Commerce to override North Carolina's objection.

8. In 1994, the Secretary of Commerce rejected the companies' override request, relying in large part on the fact that the new Panel had found a lack of adequate information in respect to certain environmental issues.

9. In 1996, Congress repealed OBPA. §109, 110 Stat. 1321–177.

D

In October 1992, after all but the two last-mentioned events had taken place, petitioners joined a breach-of-contract lawsuit brought in the Court of Federal Claims. On motions for summary judgment, the court found that the United States had broken its contractual promise to follow OCSLA's provisions, in particular the provision requiring Interior to approve an Exploration Plan that satisfied OCSLA's requirements within 30 days of its submission to Interior. The United States thereby repudiated the contracts. And that repudiation entitled the companies to restitution of the

up-front cash "bonus" payments they had made. *Conoco Inc. v. United States,* 35 Fed. Cl. 309 (1996).

A panel of the Court of Appeals for the Federal Circuit reversed, one judge dissenting. The panel held that the Government's refusal to consider the companies' final Exploration Plan was not the "operative cause" of any failure to carry out the contracts' terms because the State's objection to the companies' CZMA "consistency statement" would have prevented the companies from exploring regardless. 177 F. 3d 1331 (1999).

We granted certiorari to review the Federal Circuit's decision.

## II

The record makes clear (1) that OCSLA required Interior to approve "within thirty days" a submitted Exploration Plan that satisfies OCSLA's requirements, (2) that Interior told Mobil the companies' submitted Plan met those requirements, (3) that Interior told Mobil it would not approve the companies' submitted Plan for at least 13 months, and likely longer, and (4) that Interior did not approve (or disapprove) the Plan, ever. The Government does not deny that the contracts, made "pursuant to" and "subject to" OCSLA, incorporated OCSLA provisions as promises. The Government further concedes, as it must, that relevant contract law entitles a contracting party to restitution if the other party "substantially" breached a contract or communicated its intent to do so. See Restatement § 373(1); 11 W. Jaeger, Williston on Contracts § 1312, p. 109 (3d ed. 1968) (hereinafter Williston); 5 A. Corbin, Contracts § 1104, p. 560 (1964); see also *Ankeny v. Clark,* 148 U. S. 345, 353 (1893). Yet the Government denies that it must refund the companies' money.

This is because, in the Government's view, it did not breach the contracts or communicate its intent to do so; any breach was not "substantial"; and the companies waived their rights to restitution regardless. We shall consider each of these arguments in turn.

A

The Government's "no breach" arguments depend upon the contract provisions that "subject" the contracts to various statutes and regulations. Those provisions state that the contracts are "subject to" (1) OCSLA, (2) "Sections 302 and 303 of the Department of Energy Organization Act," (3) "all regulations issued pursuant to such statutes and in existence upon the effective date of" the contracts, (4) "all regulations issued pursuant to such statutes in the future which provide for the prevention of waste and the conservation" of Outer Continental Shelf resources, and (5) "all other applicable statutes and regulations." App. to Pet. for Cert. in No. 99–253, at 175a. The Government says that these provisions incorporate into the contracts, not only the OCSLA provisions we have mentioned, but also certain other statutory provisions and regulations that, in the Government's view, granted Interior the legal authority to refuse to approve the submitted Exploration Plan, while suspending the leases instead.

First, the Government refers to 43 U. S. C. § 1334(a)(1)(A), an OCSLA provision that authorizes the Secretary to promulgate regulations providing for "the suspension . . . of any operation or activity . . . *at the request of a lessee,* in the national interest, to facilitate proper development of a lease." (Emphasis added.) This provision, as the emphasized terms show, requires "the request of a lessee," *i. e.,* the companies. The Government does not explain how this requirement was satisfied here. Hence, the Government cannot rely upon the provision.

Second, the Government refers to 30 CFR § 250.110(b)(4) (1999), formerly codified at 30 CFR § 250.10(b)(4) (1997), a regulation stating that "[t]he Regional Supervisor may . . . direct . . . a suspension of any operation or activity . . . [when the] suspension is necessary for the implementation of the requirements of the National Environmental Policy Act or to conduct an environmental analysis." The Government says

that this regulation permitted the Secretary of the Interior to suspend the companies' leases because that suspension was "necessary . . . to conduct an environmental analysis," namely, the analysis demanded by the new statute, OBPA.

The "environmental analysis" referred to, however, is an analysis the need for which was created by OBPA, a later enacted statute. The lease contracts say that they are subject to then-existing regulations and to certain future regulations, those issued pursuant to OCSLA and §§ 302 and 303 of the Department of Energy Organization Act. This explicit reference to future regulations makes it clear that the catchall provision that references "all other applicable . . . regulations," *supra*, at 615, must include only statutes and regulations already existing at the time of the contract, see 35 Fed. Cl., at 322–323, a conclusion not questioned here by the Government. Hence, these provisions mean that the contracts are not subject to future regulations promulgated under other statutes, such as new statutes like OBPA. Without some such contractual provision limiting the Government's power to impose new and different requirements, the companies would have spent $156 million to buy next to nothing. In any event, the Court of Claims so interpreted the lease; the Federal Circuit did not disagree with that interpretation; nor does the Government here dispute it.

Instead, the Government points out that the regulation in question—the regulation authorizing a governmental suspension in order to conduct "an environmental analysis"— was not itself a *future* regulation. Rather, a similar regulation existed at the time the parties signed the contracts, 30 CFR § 250.12(a)(iv) (1981), and, in any event, it was promulgated under OCSLA, a statute exempted from the contracts' temporal restriction. But that fact, while true, is not sufficient to produce the incorporation of future statutory requirements, which is what the Government needs to prevail. If the pre-existing regulation's words, "an environmental analysis," were to apply to analyses mandated by *future*

statutes, then they would make the companies subject to the same unknown future requirements that the contracts' specific temporal restrictions were intended to avoid. Consequently, whatever the regulation's words might mean in other contexts, we believe the contracts before us must be interpreted as excluding the words "environmental analysis" *insofar as* those words would incorporate the requirements of future statutes and future regulations excluded by the contracts' provisions. Hence, they would not incorporate into the contracts requirements imposed by a new statute such as OBPA.

Third, the Government refers to OCSLA, 43 U.S.C. § 1334(a)(1), which, after granting Interior rulemaking authority, says that Interior's

> "regulations . . . shall include . . . provisions . . . for the suspension . . . of any operation . . . pursuant to any lease . . . *if there is a threat of serious,* irreparable, or immediate *harm* or damage to life . . . , to property, to any mineral deposits . . . , or to the marine, coastal, or *human environment.*" (Emphasis added.)

The Government points to the OBPA Conference Report, which says that any OBPA-caused delay is "related to . . . environmental protection" and to the need "for the collection and analysis of crucial oceanographic, ecological, and socioeconomic data," to "prevent a public harm." H. R. Conf. Rep. No. 101–653, p. 163 (1990); see also Brief for United States 32. At oral argument, the Government noted that the OBPA mentions "tourism" in North Carolina as a "major industry . . . which is subject to potentially significant disruption by offshore oil or gas development." § 6003(b)(3). From this, the Government infers that the pre-existing OCSLA provision authorized the suspension in light of a "threat of . . . serious harm" to a "human environment."

The fatal flaw in this argument, however, arises out of the Interior Department's own statement—a statement made

when citing OBPA to explain its approval delay. Interior then said that the Exploration Plan "fully complies" with current legal requirements. And the OCSLA statutory provision quoted above was the most pertinent of those current requirements. *Supra,* at 609. The Government did not deny the accuracy of Interior's statement, either in its brief filed here or its brief filed in the Court of Appeals. Insofar as the Government means to suggest that the new statute, OBPA, *changed* the relevant OCSLA standard (or that OBPA language and history somehow constitute findings Interior must incorporate by reference), it must mean that OBPA in effect created a *new* requirement. For the reasons set out *supra,* at 616, however, any such new requirement would not be incorporated into the contracts.

Finally, we note that Interior itself, when imposing the lengthy approval delay, did not rely upon any of the regulations to which the Government now refers. Rather, it relied upon, and cited, a different regulation, 30 CFR § 250.110(b)(7) (1999), which gives Interior the power to suspend leases when "necessary to comply with judicial decrees prohibiting production or any other operation or activity." The Government concedes that no judicial decree was involved in this action and does not rely upon this regulation here.

We conclude, for these reasons, that the Government violated the contracts. Indeed, as Interior pointed out in its letter to North Carolina, the new statute, OBPA, *required* Interior to impose the contract-violating delay. See App. 129 ("The [OBPA] contains provisions that specifically prohibit the Minerals Management Service from approving any Exploration Plan, approving any Application for Permit to Drill, or permitting any drilling offshore the State of North Carolina until at least October 1, 1991"). It therefore made clear to Interior and to the companies that the United States had to violate the contracts' terms and would continue to do so.

Moreover, OBPA changed pre-existing contract-incorporated requirements in several ways. It delayed approval, not only of an Exploration Plan but also of Development and Production Plans; and it delayed the issuance of drilling permits as well. It created a new type of Interior Department environmental review that had not previously existed, conducted by the newly created Environmental Sciences Review Panel; and, by insisting that the Secretary explain in detail any differences between the Secretary's findings and those of the Panel, it created a kind of presumption in favor of the new Panel's findings.

The dissent argues that only the statements contained in the letter from Interior to the companies may constitute a repudiation because "the enactment of legislation is not typically conceived of as a 'statement' of anything to any one party in particular," and a repudiation requires a "statement by the obligor to the obligee indicating that the obligor will commit a breach." *Post*, at 630–631, n. 4 (opinion of STEVENS, J.) (quoting Restatement § 250). But if legislation passed by Congress and signed by the President is not a "statement by the obligor," it is difficult to imagine what would constitute such a statement. In this action, it was the United States who was the "obligor" to the contract. See App. to Pet. for Cert. in No. 99–253, at 174a (lease, identifying "the United States of America" as the "Lessor"). Although the dissent points out that legislation is "addressed to the public at large," *post*, at 631, n. 4, that "public" includes those to whom the United States had contractual obligations. If the dissent means to invoke a special exception such as the "sovereign acts" doctrine, which treats certain laws as if they simply created conditions of impossibility, see *Winstar*, 518 U. S., at 891–899 (principal opinion of SOUTER, J.); *id.*, at 923–924 (SCALIA, J., concurring in judgment), it cannot do so here. The Court of Federal Claims rejected the application of that doctrine to this action, see

35 Fed. Cl., at 334–336, and the Government has not contested that determination here. Hence, under these circumstances, the fact that Interior's repudiation rested upon the enactment of a new statute makes no significant difference.

We do not say that the changes made by the statute were unjustified. We say only that they were changes of a kind that the contracts did not foresee. They were changes in those approval procedures and standards that the contracts had incorporated through cross-reference. The Government has not convinced us that Interior's actions were authorized by any other contractually cross-referenced provision. Hence, in communicating to the companies its intent to follow OBPA, the United States was communicating its intent to violate the contracts.

## B

The Government next argues that any violation of the contracts' terms was not significant; hence there was no "substantial" or "material" breach that could have amounted to a "repudiation." In particular, it says that OCSLA's 30-day approval period "does not function as the 'essence' of these agreements." Brief for United States 37. The Court of Claims concluded, however, that timely and fair consideration of a submitted Exploration Plan was a "necessary reciprocal obligation," indeed, that any "contrary interpretation would render the bargain illusory." 35 Fed. Cl., at 327. We agree.

We recognize that the lease contracts gave the companies more than rights to obtain approvals. They also gave the companies rights to explore for, and to develop, oil. But the need to obtain Government approvals so qualified the likely future enjoyment of the exploration and development rights that the contract, in practice, amounted primarily to an *opportunity* to try to obtain exploration and development rights in accordance with the procedures and under the standards specified in the cross-referenced statutes and regulations. Under these circumstances, if the companies did

not at least buy a promise that the Government would not deviate significantly from those procedures and standards, then what did they buy? Cf. *id.*, at 324 (the companies bought exclusive rights to explore and develop oil "*if they met*" OCSLA requirements (emphasis added)).

The Government's modification of the contract-incorporated processes was not technical or insubstantial. It did not announce an (OBPA-required) approval delay of a few days or weeks, but of 13 months minimum, and likely much longer. The delay turned out to be at least four years. And lengthy delays matter, particularly where several successive agency approvals are at stake. Whether an applicant approaches Commerce with an Interior Department approval already in hand can make a difference (as can failure to have obtained that earlier approval). Moreover, as we have pointed out, OBPA changed the contract-referenced procedures in several other ways as well. *Supra*, at 619.

The upshot is that, under the contracts, the incorporated procedures and standards amounted to a gateway to the companies' enjoyment of all other rights. To significantly narrow that gateway violated material conditions in the contracts. The breach was "substantia[l]," depriving the companies of the benefit of their bargain. Restatement § 243. And the Government's communication of its intent to commit that breach amounted to a repudiation of the contracts.

## C

The Government argues that the companies waived their rights to restitution. It does not deny that the United States repudiated the contracts *if* (as we have found) OBPA's changes amounted to a substantial breach. The Government does not claim that the United States retracted its repudiation. Cf. *id.*, § 256 (retraction will nullify the effects of repudiation if done before the other party either changes position in reliance on the retraction or communicates that it considers the repudiation to be final). It cannot claim that

the companies waived their rights simply by urging perform-
ance. *Id.*, § 257 (the injured party "does not change the ef-
fect of a repudiation by urging the repudiator to perform in
spite of his repudiation"); see also 11 Williston § 1334, at 177–
178. Nor has the Government convinced us that the com-
panies' continued actions under the contracts amount to
anything more than this urging of performance. See 2
E. Farnsworth, Contracts § 8.22, p. 544 (2d ed. 1998) (citing
*United Cal. Bank* v. *Prudential Ins. Co.*, 140 Ariz. 238, 282–
283, 681 P. 2d 390, 433–434 (App. 1983) (urging performance
and making "efforts of its own to fulfill the conditions" of the
contract come to the same thing)); cf. 11 Williston § 1337, at
186–187. Consequently the Government's waiver claim
must come down to a claim that the companies *received* at
least partial performance. Indeed, acceptance of perform-
ance under a once-repudiated contract can constitute a
waiver of the right to restitution that repudiation would oth-
erwise create. Restatement § 373, Comment *a;* cf. Restate-
ment of Restitution § 68, Comment *b* (1936).

The United States points to three events that, in its view,
amount to continued performance of the contracts. But it
does not persuade us. First, the oil companies submitted
their Exploration Plan to Interior two days *after* OBPA be-
came law. *Supra,* at 611. The performance question, how-
ever, is not just about what the oil companies did or re-
quested, but also about what they actually received from the
Government. And, in respect to the Exploration Plan, the
companies received nothing.

Second, the companies subsequently asked the Secretary
of Commerce to overturn North Carolina's objection to the
companies' CZMA consistency certification. And, although
the Secretary's eventual response was negative, the compa-
nies did at least receive that reply. *Supra,* at 613. The
Secretary did not base his reply, however, upon application
of the contracts' standards, but instead relied in large part
on the findings of the new, OBPA-created, Environmental

Sciences Review Panel. See App. 224, 227, n. 35, 232–233, 239, 244 (citing the Panel's report). Consequently, we cannot say that the companies received from Commerce the kind of consideration for which their contracts called.

Third, the oil companies received suspensions of their leases (suspending annual rents and extending lease terms) pending the OBPA-mandated approval delays. *Supra,* at 612–613. However, a separate contract—the 1989 memorandum of understanding—entitled the companies to receive these suspensions. See App. to Brief for United States 2a (letter from Toni D. Hennike, Counsel, Mobil Exploration & Producing U. S. Inc., to Ralph Melancon, Regional Supervisor, U. S. Dept. of Interior Minerals Management Service, dated Feb. 21, 1995 (quoting the memorandum as a basis for the requested suspensions)). And the Government has provided no convincing reason why we should consider the suspensions to amount to significant performance of the lease contracts in question.

We conclude that the companies did not receive significant postrepudiation performance. We consequently find that they did not waive their right to restitution.

D

Finally, the Government argues that repudiation could not have hurt the companies. Since the companies could not have met the CZMA consistency requirements, they could not have explored (or ultimately drilled) for oil in any event. Hence, OBPA caused them no damage. As the Government puts it, the companies have already received "such damages as were actually caused by the [Exploration Plan approval] delay," namely, none. Brief for United States 43–44; see also 177 F. 3d, at 1340. This argument, however, misses the basic legal point. The oil companies do not seek damages for breach of contract. They seek restitution of their initial payments. Because the Government repudiated the lease contracts, the law entitles the companies to that restitution

whether the contracts would, or would not, ultimately have produced a financial gain or led them to obtain a definite right to explore. See *supra*, at 608. If a lottery operator fails to deliver a purchased ticket, the purchaser can get his money back—whether or not he eventually would have won the lottery. And if one party to a contract, whether oil company or ordinary citizen, advances the other party money, principles of restitution normally require the latter, upon repudiation, to refund that money. Restatement § 373.

### III

Contract law expresses no view about the wisdom of OBPA. We have examined only that statute's consistency with the promises that the earlier contracts contained. We find that the oil companies gave the United States $156 million in return for a contractual promise to follow the terms of pre-existing statutes and regulations. The new statute prevented the Government from keeping that promise. The breach "substantially impair[ed] the value of the contract[s]." *Id.*, § 243. And therefore the Government must give the companies their money back.

For these reasons, the judgment of the Federal Circuit is reversed. We remand the cases for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

Since the 1953 passage of the Outer Continental Shelf Lands Act (OCSLA), 43 U. S. C. § 1331 *et seq.*, the United States Government has conducted more than a hundred lease sales of the type at stake today, and bidders have paid the United States more than $55 billion for the opportunity to develop the mineral resources made available under those leases.[1] The United States, as lessor, and petitioners, as les-

---

[1] *Conoco, Inc.* v. *United States*, 35 Fed. Cl. 309, 315, n. 2 (1996); see also U. S. Dept. of Interior, Minerals Management Service, Mineral Revenues 1999, Report on Receipts From Federal and American Indian Leases 35

sees, clearly had a mutual interest in the successful exploration, development, and production of oil in the Manteo Unit pursuant to the leases executed in 1981. If production were achieved, the United States would benefit both from the substantial royalties it would receive and from the significant addition to the Nation's energy supply. Self-interest, as well as its duties under the leases, thus led the Government to expend substantial resources over the course of 19 years in the hope of seeing this project realized.

From the outset, however, it was apparent that the Outer Banks project might not succeed for a variety of reasons. Among those was the risk that the State of North Carolina would exercise its right to object to the completion of the project. That was a risk that the parties knowingly assumed. They did not, however, assume the risk that Congress would enact additional legislation that would delay the completion of what would obviously be a lengthy project in any event. I therefore agree with the Court that the Government did breach its contract with petitioners in failing to approve, within 30 days of its receipt, the plan of exploration petitioners submitted. As the Court describes, *ante*, at 609–610, the leases incorporate the provisions of the OCSLA into their terms, and the OCSLA, correspondingly, sets down this 30-day requirement in plain language. 43 U. S. C. § 1340(c).

I do not, however, believe that the appropriate remedy for the Government's breach is for petitioners to recover their full initial investment. When the entire relationship between the parties is considered, with particular reference to the impact of North Carolina's foreseeable exercise of its right to object to the project, it is clear that the remedy ordered by the Court is excessive. I would hold that petitioners are entitled at best to damages resulting from the delay caused by the Government's failure to approve the plan within the requisite time.

(reporting more than $64 billion in royalties from federal offshore mineral leases from 1953–1999).

I

To understand the nature of the breach, and the appropriate remedy for it, it is necessary to supplement the Court's chronological account. From the time petitioners began discussing their interest in drilling an exploratory well 45 miles off the coast from Cape Hatteras in the fall of 1988, until (and even after) the enactment of the Outer Banks Protection Act (OBPA), § 6003, on August 18, 1990, their exploration proposal was fraught with problems. It was clear to petitioners as early as October 6, 1988 (and almost certainly before), that the State of North Carolina, whose approval petitioners knew they had to have under their lease terms in order to obtain the requisite permits from the Department of the Interior (DOI), was not going to go along readily. App. 61–63 (letter from North Carolina Governor James G. Martin to Ralph Ainger, Acting Regional Manager, Minerals Management Service (MMS) (a division of the DOI)). As the Court explains, *ante*, at 610, without the State's approval pursuant to the Coastal Zone Management Act (CZMA), 16 U. S. C. § 1451 *et seq.*, incorporated into the OCSLA by multiple references, no DOI licensing, permitting, or lessee exploration of any kind could ensue, 43 U. S. C. § 1340(c).

That is why petitioners pursued multiparty negotiations with the Federal Government and the State to help facilitate the eventual approval of their proposal. As part of these negotiations, petitioners entered into a memorandum of understanding with North Carolina and the Federal Government, and, according to the terms of that agreement, submitted a draft plan of exploration (POE) to DOI and to the State. App. 79–85. The Government also agreed to prepare draft and final environmental impact reports on petitioners' draft POE and to participate in public meetings and hearings regarding the draft POE and the Government's findings about its environmental impact. *Id.*, at 81–82. Among other things, this agreement resulted in the Government's preparation in 1990 of a three-volume, 2,000-page special environ-

mental report on the proposed project, released on June 1 of that year.

Although the State thereafter continued to express its dissatisfaction with the prospect of exploration and development, voicing its displeasure with the Government's draft environmental findings, *id.*, at 86–95, and rejecting petitioners' application for a separate required permit, *id.*, at 96–97,[2] petitioners nonetheless submitted a final POE to DOI on August 20, 1990, pursuant to the lease contract terms. This final plan, it must be noted, was submitted by petitioners two days *after* the enactment of the OBPA—the event petitioners claim amounted to (either) an anticipatory repudiation of the lease contracts, or a total breach, Brief for Petitioner in No. 99–244, p. 19 ("[I]n enacting the OBPA, the Government anticipatorily repudiated its obligations under the leases . . ."); Brief for Petitioner in No. 99–253, p. 21 ("The enactment of the OBPA placed the United States in total breach of the petitioners' leases").

Following petitioners' submission of the final POE, DOI then had a duty, under the terms of the OCSLA as incorporated into the lease contract, to approve that plan "within thirty days of its submission." 43 U. S. C. § 1340(c)(1). In other words, DOI had until September 19, 1990, to consider the submitted plan and, provided that the plan was complete and otherwise satisfied the OCSLA criteria, to issue its statement of approval. (Issuing its "approval," of course, is different from granting petitioners any "license or permit for

---

[2] The Federal Water Pollution Control Act, 86 Stat. 816, 33 U. S. C. § 1251 *et seq.*, requires lessees to obtain a National Pollutant Discharge Elimination System (NPDES) permit from the Environmental Protection Agency (EPA) before lessees may move forward with any exploration plan that includes discharging pollutants into the ocean, §§ 1311(a), 1342(a). The EPA cannot issue an NPDES permit, however, before the lessee has certified to the State's satisfaction that the discharge would comply with the State's CZMA requirements. Unless the Secretary of Commerce overrides any state objection arising during this process, 16 U. S. C. § 1456(c)(3), lessees will not receive the necessary permit.

any activity described in detail in an exploration plan and affecting any land use or water use" in a State's coastal zone, § 1340(c)(2); actual permission to proceed had to wait for the State's CZMA certification.) Despite this hard deadline, September 19 came and went without DOI's issuance of approval.

DOI's explanation came two days later, on September 21, 1990, in a letter to Mobil Oil from the MMS's Acting Regional Supervisor for Field Operations, Lawrence Ake. Without commenting on DOI's substantive assessment of the POE, the Ake letter stated that the OBPA "specifically prohibit[s]" the MMS from approving any POE "until at least October 1, 1991." App. 129. "Consequently," Mr. Ake explained, the MMS was suspending operation on the Manteo Unit leases "in accordance with 30 CFR § 250.10(b)(7)," *ibid.*, a regulation issued pursuant to the OCSLA and, of course, incorporated thereby into the parties' lease agreement. One week after that, on September 28, 1990, the MMS's Regional Director, Bruce Weetman, sent a letter to Governor Martin of North Carolina, elaborating on MMS's actions upon receipt of the August 20 POE. App. to Pet. for Cert. in No. 99–253, pp. 193a–195a. According to Weetman, the POE "was deemed complete on August 30, and transmitted to other Federal Agencies and the State of North Carolina on that date. Timely comments were received from the State of North Carolina and the U. S. Coast Guard. An analysis of the potential environmental [e]ffects associated with the Plan was conducted, an Environmental Assessment (EA) was prepared, and a Finding of No Significant Impact (FONSI) was made." *Id.*, at 193a. Based on these steps taken by the MMS, it concluded that the POE was "approvable" but that the MMS was "currently prohibited from approving it." Thus, the letter concluded, the POE would "remain on file" pending the resolution of the OBPA requirements, and the lease suspensions would continue in force in the interim. *Id.*, at 194a.

## II

In my judgment, the Government's failure to meet the required 30-day deadline on September 19, 1990, despite the fact that the POE was in a form that merited approval, was a breach of its contractual obligation to the contrary.[3]  After this, its statement in the September 21 Ake letter that the OBPA prohibited approval until at least October 1991 must also be seen as a signal of its intent to remain in breach of the 30-day deadline requirement for the coming year.  The question with which the Court is faced, however, is not whether the United States was in breach, but whether, in light of the Government's actions, petitioners are entitled to restitution rather than damages, the usual remedy for a breach of contract.

As the Court explains, *ante*, at 608, an injured party may seek restitution as an alternative remedy only "on a breach by non-performance that gives rise to a claim for damages for total breach or on a repudiation."  Restatement (Second) of Contracts § 373 (1979) (hereinafter Restatement (Second)). Whether one describes the suspect action as "repudiation" (which itself is defined in terms of total breach, see *ante*, at 608) or simply "total breach," the injured party may obtain restitution only if the action "so substantially impairs the value of the contract to the injured party . . . that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance."  Restatement (Second) § 243.  Although the language varies to some small degree, every major statement of contract law includes the same admonition.  See, *e. g.*, 5 A. Corbin, Contracts § 1104, pp. 558, 562 (1964) ("Restitution is an available remedy only

---

[3] It is incorrect, in my view, to assert that the Government failed to give the proposal "timely and fair consideration," *ante*, at 620, because, as the Weetman letter establishes, the Government did engage in such an evaluation process even after the enactment of the OBPA.  It was in failing to issue the approval on the heels of that evaluation that the Government ran afoul of its obligations.

when the breach is of vital importance. . . . In the case of a breach by non-performance, . . . [t]he injured party, however, can not maintain an action for restitution of what he has given the defendant unless the defendant's non-performance is so material that it is held to go to the 'essence'; it must be such a breach as would discharge the injured party from any further contractual duty on his own part"). In short, there is only repudiation if there is an action that would amount to a total breach, and there is only such a breach if the suspect action destroys the essential object of the contract. It is thus necessary to assess the significance or "materiality" of the Government's breach.

Beyond this, it is important to underscore as well that restitution is appropriate only when it is "just in the circumstances." Restatement (Second) § 243. This requires us to look not only to the circumstances of the breach itself, but to the equities of the situation as a whole. Finally, even if a defendant's actions do not satisfy the foregoing requirements, an injured party presumably still has available the standard contract remedy for breach—the *damages* petitioners suffered as a result.

### III

Given these requirements, I am not persuaded that the actions by the Government amounted either to a repudiation of the contracts altogether, or to a total breach by way of its neglect of an "essential" contractual provision.

I would, at the outset, reject the suggestion that there was a repudiation here, anticipatory or otherwise, for two reasons. First, and most basic, the Government continued to perform under the contractual terms as best it could even after the OBPA's passage.[4] Second, the breach-by-delay

---

[4] My rejection of the repudiation theory, of course, encompasses a rejection of the notion that the very enactment of the OBPA itself constituted an anticipatory repudiation of the parties' contract. Brief for Petitioner in No. 99–244, p. 19. Repudiation, as the Court explains, is in the first instance a " 'statement by the obligor to the obligee indicating that the

forecast in the Ake letter was not "of sufficient gravity that, if the breach actually occurred, it would of itself give the obligee a claim for damages for total breach." Restatement (Second) § 250, and Comment *d;* see also 11 W. Jaeger, Williston on Contracts § 1312 (3d ed. 1968).

While acknowledging the OBPA's temporary moratorium on plan approvals, the Ake letter to petitioner Mobil states that the Government is imposing a lease *suspension*—rather than a cancellation or recision—and even references an existing OCSLA regulatory obligation pursuant to which it is attempting to act. The Weetman letter explains in detail the actions the MMS took in carefully considering petitioners' POE submission; it evaluated the plan for its compliance with the OCSLA's provisions, transmitted it to other agencies and the State for their consideration, took the comments of those entities into account, conducted the requisite analyses, and prepared the requisite findings—all subsequent to the OBPA's enactment. It cannot be doubted that the Government intended to continue performing the contract to the extent it thought legally permissible post-OBPA.

Indeed, petitioners' own conduct is inconsistent with the contention that the Government had, as of August 18, 1990,

_____

obligor will commit a breach.'" *Ante,* at 608 (quoting Restatement (Second) § 250). Except in some abstract sense, the enactment of legislation is not typically conceived of as a "statement" of anything to any one party in particular, for it is, by its nature, addressed to the public at large. To the extent this legislation was directed to anyone in particular, it was to the Secretary of the Interior, directing him to take or not take certain actions, not to particular lessees. Finally, while it surely imposed upon the Secretary obligations inconsistent with the Secretary's existing duties under the leases, the OBPA itself contemplated that the parties to the lease contracts would continue, after a delay, to operate under the OCSLA-based contractual scheme. The Secretary was, within the confines of the newly enacted requirements, to continue to take steps to "carry out his responsibilities under the Outer Continental Shelf Lands Act with respect to authorizing the activities described in subsection (c)(1) [(*i. e.,* approve exploration, development and production plans for lessees, or grant an application for permit to drill; permit drilling)]." § 6003(d), 104 Stat. 557.

or indeed as of September 19, 1990, fully repudiated its obligations under the parties' contracts. As I have mentioned, it was *after* the enactment of the OBPA that petitioners submitted their final plan to the DOI—just as if they understood there still to be an existing set of contractual conditions to be fulfilled and expected to fulfill them. Petitioners, moreover, accepted the Government's proffered lease suspensions, and indeed, themselves subsequently requested that the suspensions remain in effect "from June 8, 1992 forward" under 30 CFR § 250.10(b)(6) (1990), an OCSLA regulation providing for continued lease suspension at the lessee's request "to allow for inordinate delays encountered by the lessee in obtaining required permits or consents, including administrative or judicial challenges or appeals."[5]

After the State of North Carolina filed its formal CZMA objections on November 19, 1990 (indicating that the State believed a contract still existed), petitioners promptly sought in December 1990—again under statutory terms incorporated into the contracts—to have the Secretary of Commerce override the objections, 43 U. S. C. § 1340(c)(1), to make it possible for the exploration permits to issue. In a response explainable solely on the basis that the Government still believed itself to be performing contractually obligatory terms, the Secretary of Commerce undertook to evaluate petitioners' request that the Secretary override the State's CZMA objections. This administrative review process has, I do not doubt, required a substantial expenditure of the time and resources of the Departments of Commerce and Interior, along with the 12 other administrative agencies whose comments the Secretary of Commerce solicited in evaluating the request to override and in issuing, on September 2, 1994,

---

[5] See App. 170–171 (letter from Leslie Burton, Senior Counsel for Mobil Oil, to Bruce Weetman, Regional Director, MMS, Sept. 23, 1992); see also App. to Brief for United States 1a (letter from Toni Hennike, Counsel, Mobil Oil, to Ralph Melancon, Regional Supervisor, MMS, Feb. 21, 1995) (requesting reinstatement of lease suspensions).

a lengthy "Decision and Findings" in which he declined to do so.

And petitioners were not finished with the leases yet. After petitioners received this adverse judgment from Commerce, they sought the additional lease suspensions described, see App. to Brief for United States 1a (letter from Toni Hennike, Counsel, Mobil Oil, to Ralph Melancon, Regional Supervisor, MMS, Feb. 21, 1995), insisting that "the time period to seek judicial review of the Secretary's decisions had not expired when the MMS terminated the [pre-existing] suspensions," and that "[s]ince the Secretary's decision is being challenged, it is not a final decision and will not be until it is upheld by a final nonappealable judgment issued from a court with competent jurisdiction," *id.*, at 2a. Indeed, petitioners have pending in the United States District Court for the District of Columbia at this very moment their appeal from the Secretary of Commerce's denial of petitioners' override request of North Carolina's CZMA objections. *Mobil Oil Exploration & Producing Southeast, Inc.* v. *Daley*, No. 95–93 SSH (filed Mar. 8, 2000).

Absent, then, any repudiation, we are left with the possibility that the nature of the Government's breach was so "essential" or "total" in the scope of the parties' contractual relationship as to justify the remedy of restitution. As above, I would reject the suggestion that the OBPA somehow acted *ex proprio vigore* to render a total breach of the parties' contracts. See *ante*, at 621 ("OBPA changed the contract-referenced procedures in several other ways as well"); Brief for Petitioner in No. 99–253, at 21. The OBPA was not passed as an amendment to statutes that the leases by their terms incorporated, nor did the OBPA state that its terms were to be considered incorporated into then-existing leases; it was, rather, an action external to the contract, capable of affecting the parties' actions but not of itself changing the contract terms. The OBPA did, of course, impose a legal duty upon the Secretary of the Interior to take actions

(and to refrain from taking actions) inconsistent with the Government's existing legal obligations to the lessees. Had the Secretary chosen, despite the OBPA, to issue the required approval, he presumably could have been haled into court and compelled to rescind the approval in compliance with the OBPA requirement.[6] But that this possibility remained after the passage of the OBPA reinforces the conclusion that it was not until the Secretary actually took action inconsistent with his contractual obligations that the Government came into breach.

In rejecting the Government's argument that the breach was insufficiently material, the Court's reliance on the danger of rendering the parties' bargain illusory, see *ante*, at 620, is simply misplaced. I do not contest that the Government was contractually obliged to give petitioners' POE prompt consideration and to approve the POE if, after that consideration, it satisfied existing OCSLA demands; nor would I suggest that petitioners did not receive as part of their bargain a promise that the Government would comply with the procedural mechanisms established at the time of contracting. But that is all quite beside the point; the question is not whether this approval requirement was part of the bargain but whether it was so "essential" to the bargain in the scope of this continuing contract as to constitute a total breach.

---

[6] The result of such a proceeding may well have been the issuance of a judicial decree enjoining the Secretary's actions. Ironically, the Secretary would then have been authorized under the regulatory provisions expressly incorporated into the parties' contracts to suspend the leases. 30 CFR § 250.10(b)(7) (1990) ("The Regional Supervisor may also direct ... suspension of any operation or activity, including production, because ... (7) [t]he suspension is necessary to comply with judicial decrees prohibiting production or any other operation or activity, or the permitting of those activities . . ."). Indeed, this was the very provision the DOI relied on in explaining why it was suspending petitioners' leases. App. 129–130.

Whether the breach was sufficiently "substantial" or material to justify restitution depends on what impact, if any, the breach had at the time the breach occurred on the successful completion of the project. See E. Farnsworth, Contracts § 8.16 (3d ed. 1999) ("The time for determining materiality is the time of the breach and not the time that the contract was made. . . . Most significant is the extent to which the breach will deprive the injured party of the benefit that it justifiably expected"). In this action the answer must be close to none. Sixty days after the Government entered into breach—from September 19, 1990, to November 19, 1990—the State of North Carolina filed its formal objection to CZMA certification with the United States. App. 141–148. As the OCSLA makes clear, "The Secretary *shall not grant any license or permit for any activity described* in detail in an exploration plan and affecting any land use or water use in the coastal zone of a State with a coastal zone management program . . . unless the State concurs or is conclusively presumed to concur with the consistency certification accompanying such plan . . . , or the Secretary of Commerce makes the finding [overriding the State's objection]." 43 U. S. C. § 1340(c)(2) (emphasis added); see also § 1351(d). While this objection remained in effect, the project could not go forward unless the objection was set aside by the Secretary of Commerce. Thus, the Government's breach effectively delayed matters during the period between September 19, 1990, and November 19, 1990. Thereafter, implementation was contractually precluded by North Carolina.

This fact does not, of course, relieve the Government of liability for breach. It does, however, make it inappropriate to conclude that the Government's pre-November 19 actions in breach were sufficiently "material" to the successful completion of the parties' project to justify giving petitioners all of their money back. At the time of the Government's breach, petitioners had no reasonable expectation under the lease contract terms that the venture would come to fruition

in the near future. Petitioners had known since 1988 that the State of North Carolina had substantial concerns about petitioners' proposed exploration; North Carolina had already officially objected to petitioners' NPDES submission—a required step itself dependent on the State's CZMA approval. App. 106–111. At the same time, the Federal Government's own substantial investments of time and resources, as well as its extensive good-faith efforts both before and after the OBPA was passed to preserve the arrangement, gave petitioners the reasonable expectation that the Government would continue trying to make the contract work. And indeed, both parties continued to behave consistently with that expectation.

While apparently recognizing that the substantiality of the Government's breach is a relevant question, see *ante,* at 608, the Court spends almost no time at all concluding that the breach was substantial enough to award petitioners a $156 million refund, *ante,* at 620–621. In a single brief paragraph of explanation, the Court first posits that the Government "did not announce an . . . approval delay of a few days or weeks, but of 13 months minimum and likely much longer." *Ante,* at 621. The Court here is presumably referring to the Ake letter to Mobil written a few days after the expiration of the 30-day deadline. But the Government's "statement" to this effect could matter only in the context of evaluating an intended *repudiation;* because, as I have explained, that "announcement" cannot be seen as a repudiation of the contract, I do not see how the statement itself exacerbates the effect of the Government's breach. What matters in evaluating a breach, of course, is not what the Government said, but what the Government did. And what the Government did was, as I have explained, continue to perform in every other way possible—evaluating the August 20 POE; suspending the leases, including suspensions in response to petitioners' express requests (suspensions that continue in effect

to this day); and responding over years to petitioners' appeal from the State's CZMA objection.[7]

The Court also asserts, without support, that "[w]hether an applicant approaches Commerce with an Interior Department approval already in hand can make a difference (as can failure to have obtained that earlier approval)." *Ibid.* Although the Court thereby implies that the Secretary of Commerce's handling of petitioners' CZMA override request was somehow tied to the DOI's failure to issue the required approval, there is record evidence that petitioners' CZMA appeals were not "suspended, impeded, or otherwise delayed by enactment or implementation of the . . . OBPA . . . ." App. 187 (declaration of Margo E. Jackson, *Conoco Inc.* v. *United States*, No. 92–331–C (Fed. Cl., Apr. 6, 1994) (Commerce Department supervisor in charge of handling Mobil's appeals)). Whether or not the Secretary's decision was in-

---

[7] The Court's cursory efforts to discount this evidence of continued performance fall far short. In light of the Weetman letter's detailed description of the Government's efforts to evaluate the POE as submitted, the Court's assertion that "in respect to the exploration plan, the companies received nothing," *ante,* at 622, cannot be correct. The Court itself insists on making an indispensable part of the parties' contract mutual promises to follow certain procedures, *ante,* at 620; if that is the case, we must credit the Government's efforts to follow those procedures as performance of that promise, and that performance was "received" by petitioners.

The Court also suggests that the Government was obligated to extend the lease suspensions to petitioners under the terms of the parties' separately adopted memorandum of understanding; the Government should therefore, by the Court's logic, receive no credit under the lease contracts for continuing to perform. *Ante,* at 623. Whether or not the Government was separately obligated to extend the suspensions it did (and of course the memorandum agreement only exists because of and as part of the parties' efforts to fulfill the lease contract terms), both the Government in extending the initial suspensions, and petitioners, in requesting additional suspensions, expressly relied upon regulations incorporated into the OCSLA lease contracts, see *supra,* at 631–632. The Court must stretch to avoid crediting the Government's performance.

fluenced by OBPA-required findings is, of course, a question of fact that, despite the Court's assertion, *ante*, at 622–623, none of the lower courts in this action decided. Regardless, there is certainly no *contractual* basis for the proposition that DOI's approval is a condition precedent or in any respect material to overcoming a state-filed CZMA objection. That objection, petitioners most certainly knew, was coming whether or not DOI approved the submitted POE.

In the end, the Court's central reason for finding the breach "not technical or insubstantial" is that "lengthy delays matter." *Ante*, at 621. I certainly agree with that statement as a general principle. But in this action, that principle does not justify petitioners' request for restitution. On its face, petitioners' contention that time was "of the essence" in this bargain is difficult to accept; petitioners themselves waited seven years into the renewable 10-year lease term before even floating the Outer Banks proposal, and waited another two years after the OBPA was passed before filing this lawsuit. After then accepting a full 10 years of the Government's above-and-beyond-the-call performance, time is now suddenly of the essence? As with any venture of this magnitude, this undertaking was rife with possibilities for "lengthy delays," indeed "inordinate delays encountered by the lessee in obtaining required permits or consents, including administrative or judicial challenges or appeals," 30 CFR § 250.10(b)(6) (1990). The OBPA was not, to be sure, a cause for delay that petitioners may have anticipated in signing onto the lease. But the State's CZMA and NPDES objections, and the subsequent "inordinate delays" for appeals, certainly were. The Secretary's approval was indeed "a gateway to the companies' enjoyment of all other rights," but the critical word here is "a"; approval was only one gateway of many that the petitioners knew they had to get through in order to reap the benefit of the OCSLA leases, and even that gate was not closed completely, but only "narrow[ed]," *ante*, at 621. Any long-term venture of this com-

plexity and significance is bound to be a gamble. The fact that North Carolina was holding all the aces should not give petitioners the right now to play with an entirely new deck of cards.

## IV

The risk that North Carolina would frustrate performance of the leases executed in 1981 was foreseeable from the date the leases were signed. It seems clear to me that the State's objections, rather than the enactment of OBPA, is the primary explanation for petitioners' decision to take steps to avoid suffering the consequences of the bargain they made. As a result of the Court's action today, petitioners will enjoy a windfall reprieve that Congress foolishly provided them in its decision to pass legislation that, while validly responding to a political constituency that opposed the development of the Outer Banks, caused the Government to breach its own contract. Viewed in the context of the entire transaction, petitioners may well be entitled to a modest damages recovery for the *two months* of delay attributable to the Government's breach. But restitution is not a default remedy; it is available only when a court deems it, in all of the circumstances, just. A breach that itself caused at most a delay of two months in a protracted enterprise of this magnitude does not justify the $156 million draconian remedy that the Court delivers.

Accordingly, I respectfully dissent.