# United States Court of Appeals for the Federal Circuit

———————————

**CENTURY EXPLORATION NEW ORLEANS, LLC,**
*Plaintiff-Appellant,*

AND

**CHAMPION EXPLORATION, LLC,**
*Third Party Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

———————————

2013-5073

———————————

Appeal from the United States Court of Federal Claims in No. 11-CV-0054, Judge Lynn J. Bush.

———————————

Decided: March 14, 2014

———————————

RICHARD K. LEEFE, Leefe, Gibbs, Sullivan, & Dupré, of Metairie, Louisiana, argued for plaintiff-appellant. With him on the brief were MICHAEL R. GELDER and JAMES K. STICKER, III.

GUY E. WALL, Wall Bullington & Cook, LLC, of New Orleans, Louisiana, argued for third party plaintiff-appellant.

GREGG M. SCHWIND, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and STEVEN J. GILLINGHAM, Assistant Director. Of counsel on the brief was MATTHEW T. BALLENGER, Attorney Advisor, Office of the Solicitor, United States Department of the Interior, of Washington, DC.

_____

Before LOURIE, DYK, and WALLACH, *Circuit Judges.*

DYK, *Circuit Judge.*

Appellants Century Exploration New Orleans, LLC (Century) and Champion Exploration, LLC (Champion) appeal from a judgment of the Court of Federal Claims (Claims Court) granting summary judgment to the government on the issue of breach of contract.

Century and Champion are in the business of oil and gas exploration, development, and production. They jointly leased the mineral rights to land on the Outer Continental Shelf from the government. The terms of their lease allowed the government to change existing regulatory requirements under the Outer Continental Shelf Lands Act of 1953 (OCSLA), 43 U.S.C. § 1331 et seq. The appellants argue the government breached their lease because it imposed additional regulatory requirements pursuant to the Oil Pollution Act (OPA), 33 U.S.C. § 2701 et seq. We agree with the Claims Court that the government made these changes pursuant to OCSLA, not OPA, and we affirm.

BACKGROUND

Appellants Century and Champion obtained an oil and gas lease from the government for a 5760-acre tract called Block 920, Ewing Bank (EW920) located on the Outer Continental Shelf. They made an initial bonus payment of $23,236,314 to acquire the lease and have paid the government additional rental payments of $9.50 per acre, per lease year—$54,720 per year—since that initial payment. The lease (Lease No. OCS–G 32293) became effective on August 1, 2008, and had an initial term running through July 31, 2016. Section 1 of the lease provided:

> This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462[,] 43 U.S.C. § 1331 et seq., as amended (92 Stat. 629), (hereinafter called the "Act"). The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein; and all other applicable statutes and regulations.

J.A. 88.

In *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, the Supreme Court interpreted a lease provision that was nearly identical to the one at issue here. 530 U.S. 604 (2000).[1] In *Mobil Oil*, the question was

---

[1] For the lease language of *Mobil Oil*, see *Conoco Inc. v. United States*, 35 Fed. Cl. 309, 317 (1996), *rev'd sub nom. Marathon Oil Co. v. United States*, 158 F.3d 1253 (Fed. Cir. 1998), *opinion withdrawn and superseded on*

whether certain oil company leases were subject to a new statute, the Outer Banks Protection Act, 33 U.S.C. 2753 (1990), 104 Stat. 555 (repealed 1996), which was enacted after the leases were signed and changed the requirements applicable to the lessees. *Mobil Oil*, 530 U.S. at 611-13. The Court held that the leases were subject to all statutes and regulations in existence as of their effective date, but, as to future regulations, were subject only to OCSLA regulations issued after the effective date of the leases. *Id.* at 615. Thus, the Court concluded that the government's imposition of new regulatory requirements pursuant to the Outer Banks Protection Act breached the leases. *Id.* at 620. Here, appellants similarly claim that the government changed regulatory requirements after the effective date of their lease pursuant to OPA, not OCSLA.

On April 20, 2010, an explosion and fire on the Deepwater Horizon oil rig—a semi-submersible drilling rig located in the Gulf of Mexico—killed eleven workers and resulted in an oil spill that lasted several months. Although the rig was equipped with a blowout preventer—a mechanism designed to stop the flow of oil in the event of a blowout—this device failed to function after the accident. By the time the drill operator finally managed to cap the oil well on July 15, 2010, 87 days after the initial blowout, 4.9 billion barrels of crude oil had been released into the gulf. As a result of the spill, the government imposed new regulatory requirements, which the appellants urge increase the cost of their required bond. The question is whether these requirements were imposed under OCSLA or OPA.

---

*reh'g*, 177 F.3d 1331 (Fed. Cir. 1999), *rev'd sub nom. Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604 (2000), *aff'd sub nom. Marathon Oil Co. v. United States*, 236 F.3d 1313 (Fed. Cir. 2000).

On January 25, 2011, Century filed a three-count complaint in the Claims Court. In its complaint, Century asserted that, as a result of these new regulations, "the government breached its lease agreement with plaintiffs (Count I); that it effected an uncompensated taking of its private property in violation of the Fifth Amendment (Count II); and that the government's activities may have given rise to other, unspecified causes of action (Count III)." J.A. 23. In support of its breach claim, Century alleged that the government's changes to the applicable regulations violated various sections of the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 706, were therefore unauthorized, and breached the lease. On September 12, 2011, Champion filed a complaint against the government, adopting the allegations Century set forth in its complaint. Since this appeal is exclusively concerned with the appellants' breach claims, we confine our discussion to that issue.

On July 13, 2012, the government filed a motion for summary judgment on the appellants' breach of contract claims. The government argued that it had not breached the appellants' lease. In the alternative, the government argued that even if it had breached the contract, the sovereign acts doctrine shielded it from liability. The appellants filed a cross-motion for partial summary judgment, seeking a determination that the government was liable for breach of contract.

In response to these motions, the Claims Court granted summary judgment to the government, holding that it did not breach any express term of the lease. The Claims Court also found that the government did not breach its implied duty of good faith and fair dealing. With respect to the appellants' APA challenges, the court held that it did not possess subject matter jurisdiction to hear such claims. In the alternative, the Claims Court held that the government was not liable under the sovereign acts doctrine. The Claims Court entered a final judgment

under Federal Rule of Civil Procedure 54(b) in favor of the government, dismissing the appellants' breach of contract claims with prejudice.

Century and Champion timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). We review the grant of summary judgment de novo. *United States v. Great Am. Ins. Co. of N.Y.*, 738 F.3d 1320, 1329 (Fed. Cir. 2013). The interpretation of the lease is also an issue of law that we review de novo. *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1544 (Fed. Cir. 1993).

DISCUSSION

I. Express Breach

The principal issue presented in this appeal is whether the government breached any express term of Century and Champion's lease. As discussed above, the Supreme Court considered a nearly identical oil lease provision in *Mobil Oil*. The Court held that the lease should be interpreted to protect the lessees from new statutes, new non-OCSLA regulations, and changes to the text of OCSLA itself. *Mobil Oil*, 530 U.S. at 616. But the lessees were required to comply with changes in *OCSLA regulations*. As the Court explained:

> [t]he lease contracts say that they are subject to then-existing regulations and to certain future regulations, those issued pursuant to OCSLA [and certain other statutes] . . . . This explicit reference to future regulations makes it clear that the catchall provision that references "all other applicable . . . regulations," must include only statutes and regulations already existing at the time of the contract, a conclusion not questioned here by the Government.

*Id.* at 616 (second omission in original) (internal citation omitted). This court followed the Supreme Court's interpretation of the lease language in *Amber Resources Co. v.*

*United States*, 538 F.3d 1358, 1368 (Fed. Cir. 2008), and held that similar lease language only obligated compliance with future changes to OCSLA regulations. *Id.* at 1362-63, 1368.

A

Initially, some description of OCSLA and OPA is useful. OCSLA provides that the United States, and not the individual states, shall have jurisdiction and control over the submerged lands of the Outer Continental Shelf.[2] 43 U.S.C. § 1332(1); *see Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 213 (5th Cir. 2013) ("OCSLA asserts exclusive federal question jurisdiction over the OCS."). Congress enacted OCSLA to ensure that a "vital national resource reserve held by the Federal Government for the public" would be "made available for expeditious and orderly

---

[2]    OCSLA provides the United States with legal jurisdiction over:

> the subsoil and seabed of the Outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the Outer Continental Shelf were an area of exclusive Federal jurisdiction within a State[.]

43 U.S.C. § 1333(a)(1). OCSLA defines the Outer Continental Shelf as all submerged land that is beyond the outer limits of state jurisdiction (three nautical miles from shore) and within the limits of national jurisdiction (200 nautical miles from shore). *See* 43 U.S.C. §§ 1301(a), 1331(a); *Amber*, 538 F.3d at 1362.

development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3). In furtherance of this objective, the Department of Interior (Interior Department) enters into mineral leases with private parties. These mineral leases authorize private parties, such as oil companies, to explore the Outer Continental Shelf for oil and natural gas and extract any reserves that are discovered. Thus, the only entities entitled to conduct oil and gas exploration, development, and production on the Outer Continental Shelf are lessees of the federal government. *See id.* §§ 1333(1), 1334. In enacting OCSLA, Congress was careful to stipulate that

> operations in the outer Continental Shelf should be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient *to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or to property, or endanger life or health.*

*Id.* § 1332(6) (emphasis added).

OCSLA vests the Secretary of the Interior (Interior Secretary) with the authority to regulate exploration under the oil and gas leases, as well as the resulting development and production activities. *Id.* § 1334. Specifically, OCSLA provides that the Secretary

> shall prescribe such rules and regulations as may be necessary to carry out [the provisions of OCSLA]. The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide *for the prevention of waste and conservation of the natural resources of the outer Continen-*

*tal Shelf*, and the protection of correlative rights therein, and, notwithstanding any other provisions herein, such rules and regulations shall, as of their effective date, apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter.

*Id.* § 1334(a) (emphasis added). Thus, OCSLA "authorize[s] the [Interior Department], by valid regulations, to impose anywhere in the OCS all reasonable development and production conditions it deems necessary to its stewardship of the OCS and administration of OCSLA." *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 169-70 (5th Cir. 2012) (citing 43 U.S.C. §§ 1334, 1351; H.R. Rep. 95–1474, at 115 (1978) (Conf. Rep.), *reprinted in* 1978 U.S.C.C.A.N. 1674). Pursuant to this authority, the Interior Secretary has promulgated regulations and orders that govern a lessee's oil exploration, development, and production activities on the Outer Continental Shelf. *See* 30 C.F.R. pt. 250 (2010).[3]

The Oil Pollution Act, 33 U.S.C. § 2701 et seq., is simultaneously narrower and broader in scope than OCSLA. In 1990, Congress enacted OPA in response to "rising public concern following the Exxon Valdez oil spill." *The Oil Pollution Act Overview*, United States Environmental Protection Agency, http://www.epa.gov/oem/content/lawsregs/opaover.htm (last visited Feb. 10, 2014). This law expanded the federal government's ability to respond to oil spills by imposing strict liability on parties respon-

---

[3] Unless otherwise indicated, this opinion references the version of the Code of Federal Regulations (C.F.R.) that was in effect when appellants acquired their lease. The provisions of the C.F.R. governing Outer Continental Shelf leasing, exploration, and development that are relevant to this opinion have been relocated from Part 250 of Title 30 to Part 550 of that title.

sible for releasing oil into navigable waters. *See* 33 U.S.C. §§ 2701-2713; Thomas J. Wagner, *The Oil Pollution Act of 1990: An Analysis*, 21 J. Mar. L. & Com. 569, 574-76 (1990). OPA also created the national Oil Spill Liability Trust Fund, which can be used to clean up oil spills when the party responsible is unknown or refuses to pay. *See* 33 U.S.C. § 2712; *Oil Spill Liability Trust Fund*, United States Environmental Protection Agency, http://www.epa.gov/osweroe1/content/ learning/oilfund.htm (last visited Feb. 10, 2014). Thus, unlike OCSLA, which covers all mineral activity on the Outer Continental Shelf pursuant to leases from the United States, 43 U.S.C. §§ 1331-1356, OPA is specifically designed to govern oil spill prevention, clean up, and compensation in all United States navigable waters whatever the source of the exploration, development, and production rights. Inho Kim, *Ten Years After the Enactment of the Oil Pollution Act of 1990: a Success of a Failure*, 26 Marine Pol'y 197, 197 (2002); Wagner, *supra*, at 569; *Oil Pollution Act of 1990 (OPA)*, United States Coast Guard, http://www.uscg.mil/npfc/About_NPFC/opa.asp (last visited Feb. 11, 2014). However, the OPA regulations involved here only apply to activities on the Outer Continental Shelf. *See* 30 C.F.R. ch. II, pt. 254, subpt. B.

Oil and gas companies leasing land on the Outer Continental Shelf must comply with both OCSLA and OPA. These statutes contain some overlapping provisions, in particular those relating to the remediation of oils spills. For example, during the relevant period, both OCSLA and OPA regulations required oil companies to submit Oil Spill Response Plans. OCSLA regulation 30 C.F.R. § 250.219 required all Outer Continental Shelf lessees to provide such a plan. *See also* Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Plans and Information, 70 Fed. Reg. 51,478-01 (Aug. 30, 2005). OPA regulation 30 C.F.R. § 254.1 required all owners or operators of oil handling, storage, or transportation facilities

"located seaward of the coast line" (that is, on the Outer Continental Shelf) to submit a plan. 30 C.F.R. § 254.1. OCSLA and OPA regulations required these plans to ensure that oil and gas companies were prepared to respond to any oil spills that might result from their activities off the United States coastline.

Even prior to the execution of the appellants' lease, OCSLA and its implementing regulations required lessees to submit an exploration plan to the government before commencing any drilling activities. *See* 43 U.S.C. § 1340(c)(1), (e)(2); 30 C.F.R. § 250.201 (2010). Such an exploration plan detailed the lessee's proposed exploration activities on the Outer Continental Shelf and required government approval before the lessee commenced any exploration activity. 30 C.F.R. § 250.201 (2010). Importantly, the regulations required that such an exploration plan include an Oil Spill Response Plan that contained a calculation of the volume of oil that would result from a worst case discharge scenario. *Id.* § 250.219(a)(2)(iv) (2010). A worst case discharge scenario was defined as "the daily rate of an uncontrolled flow of natural gas and oil from all producible reservoirs into the open wellbore"[4] that would result from a blowout, such as the one that triggered the Deepwater Horizon disaster. *Worst Case Discharge Determination*, Bureau of Ocean Energy Management, http://www.boem.gov/Oil-and-Gas-Energy-Program/Resource-Evaluation/Worst-Case-Discharge/Index.aspx (last visited Feb. 11, 2014). Lessees were also required to "demonstrate oil spill financial

---

[4]    The wellbore is the hole the lessee or operator has drilled for the purpose of exploring or extracting natural gas or oil from the earth. In the oil production context, reservoirs are subsurface pools of hydrocarbons, such as crude oil or natural gas, contained in porous or fractured rock formations.

responsibility for facilities proposed in [their exploration plan]," 30 C.F.R. § 250.213(e)(2) (2010), and the appellants elected to comply by posting a bond. *See* 30 C.F.R. § 253.20 (2010) (describing the different methods of demonstrating oil spill financial responsibility). The appellants' bond requirements depended on their worst case discharge volume: the greater the worst case discharge volume, the larger the bond required to cover their potential liability. *See id.* § 253.13 (2010) (setting out the correspondence between worst case discharge volume and bond requirement).[5]

OPA did not require oil companies to submit an exploration plan; rather, each company was required to submit an Oil Spill Response Plan, which included a worst case discharge scenario. As with the OCSLA requirements, this only applied to Outer Continental Shelf lessees.

---

[5] The appellants also argue that their increased bonding requirements breached Section 8 of the lease. Section 8 reads: "The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary." J.A. 89. Section 8 refers to 30 C.F.R. § 250.213(e)(1)'s "appropriate bond" requirement, also known as the performance bond requirement. As the Claims Court accurately explained, "[i]n order to demonstrate a breach of section 8 of the lease, plaintiffs must establish that they are now required to furnish a bond that exceeds the bond required under the regulations in effect when the lease was executed." J.A. 40. Because the appellants' performance bonding requirement has not changed, there has been no breach of Section 8 of the lease.

The OCSLA regulations borrowed and incorporated the OPA regulation's method of calculating worst case discharge volume and the assumptions for that calculation. Thus, Outer Continental Shelf lessees were required to follow § 254.27's methodology when calculating worst case discharge volume for OCSLA purposes, and all oil and gas operators were required to follow § 254.27's methodology when calculating worst case discharge volume for OPA purposes. Finally, § 250.103, an OCSLA regulation, enabled the government to issue Notices to Lessees and Operators (NTLs) that "clarify, supplement, or provide more detail about certain requirements," *id.*, of the OCSLA statute and regulations. As the Interior Department has explained, it "issues NTLs to explain and clarify its regulations." Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Plans and Information, 70 Fed. Reg. 51,478-01, 51,478 (Aug. 30, 2005). The OPA statute and the OPA regulations thereunder made no provision for the issuance of NTLs.

The appellants contend that the NTLs in this case are equivalent to new regulations within the meaning of the lease provisions. Even assuming the NTLs are new regulations, however, they were issued pursuant to OCSLA, and thus do not breach the lease.

## B

The change at issue here concerns the worst case discharge calculation and the bond requirement that corresponds to that calculation. The government issued Notice to Lessees No. 2010–N06 (NTL-06) and related documents on June 18, 2010, after the effective date of the lease. This order and the various documents explaining it required lessees to make changes to the way they calculated worst case discharge volume. *See infra* Slip. Op. at 14-16. The only identified consequence of this alteration was to alter the lessees' bond requirement.

The appellants argue that the government's issuance of NTL-06 breached their lease because: (1) it changed the worst case discharge scenario, thereby imposing additional bonding costs, and (2) the change was made pursuant to OPA, not OCSLA. There appears to be no dispute as to the first question. At oral argument, the appellants clarified that, in their view, NTL-06 resulted in four principal changes to the worst case discharge calculation, which increased their corresponding bond requirement.[6] First, and most importantly, after the effective date of the lease, the government sent an email to Century[7] stating that under NTL-06, the appellants must "[i]ncrease the length of time [of] the uncontrolled blowout response from 30 to 120 days." J.A. 1432. Prior to NTL-06, the OCSLA regulations, by reference to OPA regulation 30 C.F.R. § 254.47(a)(3), only required oil company lessees to assume that oil would flow from their wells for 30 days

---

[6]    In addition to these four principal changes, NTL-06 also rescinded an older order, NTL-08, which had waived certain regulatory requirements for particular lessees. As the appellants conceded at oral argument, the rescission of NTL-08 is not relied on in the complaint. Therefore, we do not discuss NTL-08 here.

[7]    The government sent this email to Century directly, instead of both Century and Champion, because Century was the designated lease operator. As the lease operator, Century was in charge of submitting the appellants' exploration plan, meeting the bond requirements, and applying for permits to drill. *See* 30 C.F.R. § 250.105 (2013) ("Operator means the person the lessee(s) designates as having control or management of operations on the leased area or a portion thereof. An operator may be a lessee, the BSEE-approved or BOEM-approved designated agent of the lessee(s), or the holder of operating rights under a BOEM-approved operating rights assignment."); J.A. 88.

during a blowout when calculating their worst case discharge volumes. The government email to Century explained that the appellants should revise their OCSLA-mandated exploration plan in light of NTL-06 and now assume that oil would flow from their well for 120 days when calculating the worst case discharge volume.

Second, prior to the issuance of NTL-06, lessees did not have to include all reservoirs that a drilling operator might pass through to reach its intended drilling location in the calculation of the uncontrolled flow that could result from a blowout. The parties do not specify the source of this obligation. However, the frequently asked questions document (FAQ document) accompanying NTL-06 apparently modified this requirement. Under NTL-06, lessees must "consider *all* reservoirs, not just where you're drilling to, but anything you might pass through" when calculating worst case discharge volume. Oral Argument 5:57-6:02, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/all/century-exploration.html. More specifically, lessees must now "determine the daily rate of an uncontrolled flow from *all producible* reservoirs into the open wellbore." J.A. 663 (emphasis added).

Third, NTL-06 changed assumptions regarding what could be treated as being in the wellbore when calculating worst case discharge volume. Previously, lessees counted the fact that certain equipment, such as drillpipe, logging tools, and drill bits were in the wellbore, thereby reducing total discharge volume, when they calculated worst case discharge volume. Again, the source of this requirement is unclear. However, the FAQ document explained that lessees "should [now] assume that the wellbore *is free of* drillpipe, logging tools, or other similar equipment." J.A. 665 (emphasis added). Thus, under NTL-06, lessees "no longer consider anything being in the wellbore." Oral Argument 5:47-5:51, *available at*

http://www.cafc.uscourts.gov/oral-argument-
recordings/all/century-exploration.html.

Fourth, NTL-06 prohibits lessees from including the presence of a blowout preventer (the mechanism that failed to contain the Deepwater Horizon blowout) in their worst case discharge calculation. As the appellants explained at oral argument, "for years beforehand you counted the fact that you had a blowout preventer on the well when you determined worst case discharge." *Id.* at 17:52-18:02. Once again, the source of this requirement is not specified. However, the FAQ document stated that lessees should now assume that a blowout preventer is not connected to the wellhead.

Prior to the issuance of NTL-06, the appellants' worst case discharge volume was 1,500 barrels and their corresponding bond requirement amounted to $35 million. The appellants contend, and the government does not contest, that NTL-06 and the various documents explaining that order increased their worst case discharge volume to 142,977 barrels per day and their corresponding bond requirement to $150 million.

C

While not disputing the existence of the changes or their impact, the government urges that the changes were made pursuant to OCSLA, not OPA. The appellants argue that they were made pursuant to OPA. More precisely, appellants argue that because NTL-06 and related documents changed the assumptions lessees must follow when calculating their worst case discharge volume, and the regulation governing the worst case scenario calculation is an OPA regulation, NTL-06 effectively changed an OPA regulation. In response, the government explains that the OCSLA regulation outlining what oil spill information lessees must include in their exploration plans, § 250.219(a)(2)(iv), simply incorporates the OPA methodology for calculating worst case discharge volume through

reference. The government points out that NTL-06 did not change the text of the OPA regulation itself. Rather, in the government's view, it altered only OCSLA regulatory requirements.

We agree with the government. Initially, it is important that OCSLA authorized the government to adopt regulations concerning blowout protection and worst case discharge scenarios; the government did not need to act under the authority granted by OPA. Pursuant to Section 1 of the lease, the government could issue new OCSLA regulations which provide for the "prevention of waste and conservation of the natural resources of the Outer Continental Shelf" by the lessees. J.A. 88. This lease provision can be traced directly to § 1334 of OCSLA: "The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order *to provide for the prevention of waste and conservation of the natural resources* of the outer Continental Shelf, and the protection of correlative rights therein . . . ." 43 U.S.C. § 1334 (emphasis added).

The case law interpreting § 1334 gives a broad scope to the phrase "prevention of waste and conservation of the natural resources," making clear that it extends to environmental protection. *See, e.g.*, *Pauley Petroleum Inc. v. United States*, 591 F.2d 1308, 1325 (Ct. Cl. 1979) (explaining that a new regulation imposing absolute liability on lessees for any pollution resulting from their activities would be "lawful and reasonable" because OCSLA provides "'[t]he Secretary may at any time prescribe and amend such rules and regulations [] in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf'" (quoting 43 U.S.C. § 1334(a)(1) (1970))); *Get Oil Out! Inc. v. Exxon Corp.*, 586 F.2d 726, 729 (9th Cir. 1978); *Union Oil Co. of Cal. v. Morton*, 512 F.2d 743, 749-50 (9th Cir. 1975) (stating that the phrase "conservation of the natural resources of the outer Continental Shelf" "encompasses all

the natural resources of the shelf, not merely the mineral resources" (citations omitted)); *Gulf Oil Corp. v. Morton*, 493 F.2d 141, 145 (9th Cir. 1973) ("[I]n authorizing the Secretary to issue regulations, [OCSLA] speaks of 'conservation of the natural resources of the outer Continental Shelf,' not just of conservation of oil, gas, sulphur and other mineral resources. . . . Its natural meaning would encompass all such resources, not just oil and gas, sulphur and other minerals." (quoting 43 U.S.C. § 1334(a))). Thus, the case law supports a finding that OCSLA endows the government with the authority necessary to regulate worst case discharge scenarios and to require adequate bonding. *See also* 43 U.S.C. § 1337(a)(7)(A) (authorizing the Interior Secretary to require lessees to post a bond in accordance with the applicable regulations).

Nevertheless, the appellants point out that the mere existence of government authority to act under OCSLA does not immunize the government from liability for regulatory changes. To avoid liability for changes, the government must also have acted *pursuant* to OCSLA authority. In *Mobil Oil*, the government argued that, irrespective of the statutory change at issue in that case, the government could have undertaken the exact same action pursuant to OCSLA. 530 U.S. at 615-16. The Supreme Court rejected this argument, recognizing that the new requirements were "created by [the Outer Banks Protection Act], a later enacted statute," *Mobil Oil*, 530 U.S. at 616, not an OCSLA regulation. The court explained that "[t]he fatal flaw in [the government's] argument [] arises out of the Interior Department's own statement—a statement made when citing the Outer Banks Protection Act to explain its approval delay." *Id.* at 617-18. Thus, even though OCSLA may have permitted the government to require the exact same actions the Outer Banks Protection Act required, because the government cited the Outer Banks Protection Act as the

authority for carrying out these actions, the Court found that the government effectuated them pursuant to the Outer Banks Protection Act and was liable for breach. In reaching this conclusion, the Supreme Court emphasized the government's *chosen source of authority*: the government cited the Outer Banks Protection Act, not OCSLA regulations. *Id.*

We confirmed this approach in *Amber*. In *Amber*, Congress amended the Coastal Zone Management Act to impose new regulatory requirements. 538 F.3d at 1366. Thus, *Amber* turned on whether these new requirements breached the oil companies' contracts. *Id.* Relying on *Mobil Oil*, we reasoned that "[b]ecause the 1990 [Coastal Zone Management Act] amendments . . . imposed significantly more burdensome requirements for granting lease suspensions, the new statute in this case breached the lease agreements in the same way as the new statute in *Mobil Oil*." *Id.* at 1371. The government argued that it could have undertaken the exact same action pursuant to the OCSLA regulations in effect at that time. *Id.* at 1372. Nevertheless, because the government imposed new requirements based on the *new statutory* changes to the Coastal Zone Management Act, not *existing OCSLA regulations*, we held that these requirements breached the contract. *Id.*

Here, we reach a different conclusion. Although, as discussed above, both the OCSLA and OPA worst case discharge scenario regulations are limited to OCS lessees, we conclude that the government changed the appellants' worst case discharge calculation pursuant to OCSLA. First, NTL-06 itself identified OCSLA regulation § 250.103 as its source of authority. NTL-06 only referenced and discussed OCSLA regulations and requirements. As NTL-06 explains, OCSLA regulations § 250.219 and § 250.250 required "all [OCSLA exploration] plans" to be "accompanied by information regarding oil spills, including calculations of [the lessee's] worst case dis-

charge scenario." J.A. 657. Although OCSLA regulation § 250.219(a)(2)(iv) instructed lessees to calculate their worst case discharge volume according to the OPA regulation methodology, NTL-06 never mentioned the OPA regulations. NTL-06 simply augmented the factors lessees must consider when calculating their worst case discharge scenario for *OCSLA purposes*.[8]

Second, there has been no showing or even suggestion that the NTL-06 changes applied outside the OCSLA context. Critically, NTL-06 states that it only changes a lessee's worst case discharge scenario "required by [OCSLA regulation] 30 C.F.R. § 250.219(a)(2)(iv)." J.A. 658. NTL-06 did not change the text of the relevant OPA regulation, § 254.47, and nothing suggests that NTL-06 altered any part of the OPA regulation. Indeed, the appellants do not claim that NTL-06 changed the text of relevant OPA regulation. NTL-06 merely changed the way an OCSLA regulation incorporates an OPA calculation. Moreover, for three out of the four alleged alterations to the worst case discharge calculation, it is not even clear that the original requirement was an OPA requirement. A change to an OCSLA regulation does not breach the express terms of the lease language as interpreted by the Supreme Court in *Mobil Oil* and this court in *Amber*.[9]

---

[8]    At oral argument, the appellants also contended that the changes NTL-06 brought about were made pursuant to OPA because a later issued NTL, NTL No. 2012-N06, altered OPA regulation § 254.47(b). Issued on August 10, 2012, after the appellants filed their complaint and after the government moved for summary judgment, NTL No. 2012-N06 is irrelevant to this appeal, and we decline to discuss it. The same is true of NTL 2013-N02.

[9]    The appellants suggest that in adopting OCSLA regulation 30 C.F.R. § 250.219, the Interior Department recognized that the worst case discharge calculation was

included in the OCSLA regulation merely as a "stream-lined" means to comply with OPA. Century's Reply Br. 12 (quoting Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Plans and Information, 70 Fed. Reg. at 51,486). This is not correct. The OCSLA regula-tion in question states that lessees may provide, as an alternative to an individual Oil Spill Response Plan (OSRP), "[r]eference to [an] approved regional OSRP (see 30 C.F.R. 254.3) [that must] . . . include: . . . [1] The calculated volume of your worst case discharge scenario (see 30 C.F.R. 254.26(a)), and [2] a comparison of the appropriate worst case discharge scenario in your ap-proved regional OSRP with the worst case discharge scenario that could result from your proposed exploration activities." 30 C.F.R. § 250.219(a)(2)(iv) (2010).

The comment in the Federal Register on which the appellants rely was directed to the second aspect of the regulation. The Interior Department's summary of the comment reads: "With respect to paragraph (a)(2)(iv), [the Offshore Operators Committee] inquires regarding the purpose of providing a comparison between the site specif-ic worst case discharge and that in the regional OSRP." The Interior Department's response to the comment was similarly limited: "No change. . . . MMS uses the infor-mation required under paragraph (a)(2)(iv) as a stream-lined means to ensure compliance with requirements of the Oil Pollution Act of 1990." Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Plans and Information, 70 Fed. Reg. 51,478-01, 51,486 (Aug. 30, 2005) (codified at 250.219(a)(1)(iv) (2010)). Neither the comment nor the response concerned the requirement to provide a worst case discharge scenario. *See* Summary of the Offshore Operators Committee's Comments on Sub-part B Proposed Regulation at 35-40, Bureau of Safety and Environmental Enforcement (on file with Bureau of Safety and Environmental Enforcement).

## II. Implied Breach and Administrative Procedure Act Challenges

We have considered the appellants' other arguments and find them to be without merit. Appellants cannot rely on the implied covenant of good faith and fair dealing to change the text of their contractual obligations. As this court recently clarified in *Metcalf Construction, Inc. v. United States*,

> the 'implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions.' . . . [O]ur formulation means simply that an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision. The implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value.

No. 2013-5041, Slip Op. at 10 (Fed. Cir. Feb. 11, 2014) (quoting *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010)); *see also Precision Pine*, 596 F.3d at 829-31 (Fed. Cir. 2010) ("The government may be liable for damages when the subsequent government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract."); 13 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 63:22 (4th ed. 2000) ("As a general principle, there can be no breach of the implied promise or covenant of good faith

and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract."). We hold that the government has not breached its implied duty of good faith and fair dealing because the lease expressly authorized the government action at issue here: changes to OCSLA regulatory requirements.

We also affirm the Claims Court's holding that it is without subject matter jurisdiction to decide the appellants' APA challenges. *See Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1370 n.11 (Fed. Cir. 2005) ("Of course, no APA review is available in the Court of Federal Claims.").[10] Because we have found no breach in this case, we need not reach the government's sovereign acts defense.[11]

**AFFIRMED**

---

[10] The appellants also argue that the term "other applicable statutes" in Section 1 of the lease should be interpreted to incorporate the APA. Appellant Century's Br. 8, 28. However, as the Claims Court correctly concluded, the APA is not an applicable statute in the sense of the lease language.

[11] In arguing that the government breached its implied duty of good faith and fair dealing, the appellants mention other post-Deepwater Horizon changes to the regulatory requirements such as two separate government-issued moratoria on drilling, a new Drilling Safety Rule, and another NTL (NTL-10). We do not discuss these changes because the appellants have not articulated a theory under which they form a basis for breach liability.