ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Military Aircraft Parts | ) | ASBCA No. 60904 |
| | ) | |
| Under Contract No. SPE4A7-13-M-4596 | ) | |

APPEARANCE FOR THE APPELLANT:    Mr. Robert E. Marin
                                 President

APPEARANCES FOR THE GOVERNMENT:    Daniel K. Poling, Esq.
                                     DLA Chief Trial Attorney
                                   Edward R. Murray, Esq.
                                     Trial Attorney
                                     DLA Aviation
                                     Richmond, VA

OPINION BY ADMINISTRATIVE JUDGE PEACOCK

This timely appeal involves the withdrawal of a purchase order (PO) to acquire eight air duct assemblies for installation in the fuselage of the KC-135 aircraft. Military Aircraft Parts (MAP or appellant) alleges that, although the due date for delivery of the supplies had passed, the offer to purchase was revived and thereafter appellant tendered four of the assemblies that substantially complied with the terms of the purchase order. Appellant elected to have the appeal processed pursuant to the expedited procedures of Board Rule 12.2.[*] A hearing was conducted on 2-3 March 2017 and briefing was completed on 21 March 2017. For the following reasons, the appeal is denied.

FINDINGS OF FACT

1. On 15 November 2012, the Defense Logistics Agency Aviation (DLA) issued Request for Quotations No. SPE4A7-13-T-2198 for eight air duct assemblies, National Stock Number (NSN) 1660-01-590-7060 (R4, tab 3 at 1-2, 4, 12).

2. The duct assembly is a component of the air conditioning ductwork for the KC-135, which provides warm and cool air to the aircraft. The ductwork is located in the fuselage of the KC-135 and is in a "crowded area" surrounded by other systems, such as hydraulic lines, watering bundles, and webbing. If this particular duct assembly

---

[*] The Contract Disputes Act, as implemented by the Board's Rules provides that a decision under Rule 12.2 shall have no value as precedent, and in the absence of fraud, shall be final and conclusive and may not be appealed or set aside.

failed, it would at the very least begin vibrating and break some of the brackets, causing the ductwork to move. If it came loose, it could begin breaking other brackets and potentially impact other equipment, such as a hydraulic line. (Tr. 1/183-86)

3. For these reasons, the duct assembly is designated as a "CRITICAL APPLICATION ITEM" (R4, tab 1 at 6, tab 3 at 6). FAR 46.203(c) identifies a "critical application item as one in which the failure of the item could injure personnel or jeopardize a vital agency mission."

4. The duct assembly includes three components at issue in this litigation. The first component is a lock bolt (Part No. BACB30DX) (R4, tab 34). Three of these lock bolts are used to fasten a metal assembly onto one end of the part, where it clamps to the next piece of ductwork (tr. 1/196-200). This stiffens the ductwork and allows the attachment of two rods, which prevents the part from vibrating or moving (tr. 1/197). If one of the bolts failed, the part would start to come loose and likely cause the other bolts to fail, causing "that area to start coming apart" (tr. 1/198). The BACB30DX is an improvement over its predecessor, Part No. BACB30AL. The BACB30DX specification requires the use of 8740 alloy steel, per MIL-S-6049 or AMS 6322, while also allowing for optional materials. (R4, tabs 10, 34 at 5; tr. 1/215-19) The BACB30AL uses different materials (R4, tab 33 at 2; tr. 1/215-19). The BACB30DX also provides a higher level of cadmium plating than the BACB30AL. The cadmium plating provides "more protection for corrosions, less likely to corrode, longer life in the part." (R4, tabs 33-34, 36; tr. 1/219-21, 251)

5. The second component at issue is a flange, Part No. BACF22N400 (R4, tab 35). The flange connects the smaller end of the duct assembly to another duct. The two parts are held together by a clamp. If the flange were to fail, the duct assembly would come loose from the neighboring duct, creating a loss of rigidity and leading to vibration. (Tr. 1/229-31)

6. The third component at issue is the NASM20615 rivet (R4, tabs 36-37). The rivets are used in various areas throughout the duct assembly (R4, tab 41; ex. A-22 at 431-32).

7. The solicitation described the duct assembly technical data package, which was available to all potential offerors (R4, tab 3 at 4-12). The technical data package identified specific exceptions to the drawings. Of particular importance in this case is Exception 11, which pertained to the lock bolts and stated "USE BACB30DX IN LIEU OF BACB30AL. LOCK BOLT DASH NUMBERS REMAIN UNCHANGED." (R4, tab 3 at 4) The technical data package in the solicitation also referenced the Boeing lock bolt specification for BACB30DX (Revision V, dated 15 June 2007) and the specification was made available to offerors (R4, tab 3 at 9, tab 35). The technical data package did not include the BACB30AL specification.

2

8. The solicitation was a simplified acquisition and incorporated the terms and conditions set forth in DLA's Master Solicitation for EProcurement Automated Simplified Acquisitions Revision 8 (November 2012) (R4, tab 3 at 1, tab 40; tr. 1/97-98). The terms and conditions included several clauses relevant to the instant dispute.

9. The Master Solicitation included FAR 52.211-5, MATERIAL REQUIREMENTS (AUG 2000) (R4, tab 40 at 6). Section (b) of the Material Requirements clause required that "the Contractor shall provide supplies that are new, reconditioned, or remanufactured, as defined in this clause" (R4, tab 27). Sections (d) and (e) stated that, if the contractor intended to provide "used, reconditioned, or remanufactured supplies," it must submit "a detailed description of such supplies" to the contracting officer and that such supplies "may be used in contract performance if the Contractor has proposed the use of such supplies, and the Contracting Officer has authorized their use" (R4, tab 27).

10. The Master Solicitation also included clause DLAD 52.211-9014, CONTRACTOR RETENTION OF TRACEABILITY DOCUMENTATION (OCT 2008) (R4, tab 40 at 8). The clause stated that, "whenever the Contractor is not the manufacturer of the item(s) to be furnished" under the order:

> (b)(1) The Contractor shall retain evidence to document that items furnished under this contract conform to contract requirements. Evidence will generally include information tracing the items back to the manufacturing source or its authorized distributor. **At a minimum, evidence shall be sufficient to establish the identity of the item, its manufacturing source**, and conformance to the item description.

(R4, tab 29 at 1) (Emphasis added) The clause further required the contractor to provide the information "[a]t the time of Government source inspection" and required the contractor to "retain documentation in accordance with this clause for 5 years after final payment" (id. at 2).

11. The Master Solicitation also included clause DLAD 52.246-9008, INSPECTION AND ACCEPTANCE AT ORIGIN (NOV 2011) (R4, tab 40 at 18). Subsection (e)(1) states that "[i]f the Contractor is not the manufacturer of the supplies, evidence must be furnished to establish that the supplies were produced by the manufacturer" (R4, tab 31).

12. The Master Solicitation also included the DLAD 52.211.9000, GOVERNMENT SURPLUS MATERIAL (NOV 2011) clause, (R4, tab 40 at 14). Subsection

3

(f) of the clause noted that "[o]ffers of commercial surplus, manufacturer's overruns, [and] residual inventory resulting from terminated Government contracts...will be evaluated in accordance with the provision at 52.217-9002" (R4, tab 28 at 4-5). The latter clause, was titled CONDITIONS FOR EVALUATION AND ACCEPTANCE OF OFFERS FOR PART NUMBERED ITEMS (DEC 2011) (R4, tab 40 at 9). Section (i) of the clause states:

> The Contracting Officer may at any time, pre-award or post-award, request evidence of the technical acceptability of the supplies offered in response to this solicitation. **At a minimum, evidence must be sufficient to establish the identity of the product and its manufacturing source.** The Contracting Officer determines the acceptability and sufficiency of documentation or other evidence, at his or her sole discretion. **If the Contracting Officer requests evidence** from a Contractor who received an award resulting from this solicitation **and the Contracting Officer subsequently finds the evidence to be unacceptable, or if the Contractor fails to provide the requested evidence, the award may be cancelled.**

(R4, tab 30 at 8) (Emphasis added)

13. The Master Solicitation further included clause DLAD 52.246-9043, HIGHER-LEVEL CONTRACT QUALITY REQUIREMENT (NON-MANUFACTURERS) (NOV 2011), which applied when the FAR 52.246.11, HIGHER-LEVEL CONTRACT QUALITY REQUIREMENT clause, applied to the solicitation (the Master Solicitation also included FAR 52.246-11) (R4, tab 40 at 11, 18). This clause also required the contractor to maintain evidence of the identity of the manufacturer of items provided under the contract, stating:

> [T]he Contractor represents that it shall...(b) Maintain and provide objective evidence that items furnished under this contract were produced at a manufacturing facility conforming to the specified higher-level contract quality requirement and that the material meets contract requirements. **At a minimum, evidence shall be sufficient to establish the identity of the product and its manufacturing source....**

(R4, tab 32)

4

14. Traceability reduces the risk that the materials used are counterfeit rather than authentic (tr. 1/247, 273, 2/14, 16). Extensive traceability requirements are standard practice in the commercial aviation industry as well (tr. 2/55, 57, 63, 69).

15. On 27 November 2012, MAP "Bid Without Exception" in response to the solicitation (R4, tab 4 at 1). Under "Material Requirements," MAP answered "No" when asked whether it would provide "Used, Reconditioned, Remanufactured, or New/Unused Government Surplus" (*id.* at 1). MAP did not obtain authorization from the contracting officer to use material that was used, reconditioned, remanufactured or government surplus (tr. 1/109-10, 2/42-43).

16. On 26 January 2013, DLA awarded MAP unilateral PO No. SPE4A7-13-M-4596 for eight of the air duct assemblies at a unit price of $18,700 (R4, tab 1 at 14). All eight parts were due on 23 October 2013 (*id.*). All of the above-noted provisions of the solicitation were incorporated into the PO (*id.*).

17. A MAP engineer was assigned to develop a parts list or "production traveler" identifying, *inter alia,* the necessary parts needed for manufacturing the air duct assemblies. The engineer noted on the list, among other things, that the specifications required use of the BACB30DX lock bolt in lieu of the superseded BACB30AL bolt. The MAP engineer also noted the need for eight BACF22N400 flanges four of which were in stock. (R4, tab 53 at 4, tab 54 at 7, tab 60; tr. 2/179, 231) The in-stock flanges had been purchased from a surplus dealer, who had purchased them from a United Kingdom company, who had purchased them at a bulk sale from FLS Aerospace, an entity in an unidentified location. The latter firm provided no evidence regarding where it had obtained the flanges. (R4, tab 15 at 22-28, tab 25)

18. The Boeing specification for BACF22N400, specified in the solicitation and order, includes only one authorized source, Aeroquip Corp., CAGE Code 8W928 (R4, tab 1 at 8, tab 35 at 3; tr. 1/231, 234). Accordingly, only flanges manufactured by Aeroquip meet the BACF22N400 specification requirements. The flanges purchased and installed by MAP did not meet this contract requirement. There is no identification of who manufactured the in-stock flanges. (R4, tab 15 at 21-28; tr. 1/234, 239)

19. On 10 July 2013 appellant's president, Mr. Marin, emailed a parts supplier to order BACB30AL lock bolts. On 16 July 2013, the parts supplier responded that such bolts had been superseded by the current Boeing specification which required BACB30DX bolts. The supplier provided MAP a quote for the BACB30DX bolts. (R4, tab 62; tr. 2/75)

5

20. On 17 July 2013, Mr. Marin ordered superseded BACB30AL surplus lock bolts from another supplier (R4, tab 15 at 36).

21. In addition to failing to meet the contract requirement to use BACB30DX bolts, the BACB30AL bolts purchased by MAP from the alternate supplier did not meet the PO requirements for traceability to the manufacturer and were over 50 years old and likely would have lost significant corrosion protection since their manufacture (R4, tab 15 at 32-33, tab 33 at 2; tr. 1/210-11, 2/5-7, 45).

22. Although the manufacturer of the rivets used in the assemblies was documented by MAP, the documentation from MAP's parts supplier indicated that the rivets were used/repaired/overhauled surplus and not new parts (R4, tab 15 at 2, 8, 12-19; tr. 2/41-42).

23. On 17 September 2013, MAP also purchased four surplus BACF22N400 flanges for the assemblies that could not be traced back to the manufacturer (R4, tab 64 at 14; tr. 1/244-45).

24. MAP failed to deliver any of the air duct assemblies by the contractually scheduled date of 23 October 2013. In late October a series of conversations occurred between MAP and the government regarding the status of the items. On 6 November 2013, Mr. Marin informed the government that four assemblies were ready for inspection at MAP facilities. Previously, on 29 October 2013, Mr. Marin had notified the government that the remaining four assemblies were awaiting parts and could not ship until 23 February 2014. (R4, tabs 10-13; tr. 1/113-14)

25. On 7 and 12 November 2013, the government inspected the four tendered assemblies. It discovered the aforementioned deficiencies with the installed bolts, flanges, and rivets which were extensively analyzed and discussed with MAP over approximately the next two weeks. (R4, tab 15 at 2-36, tab 16 at 1-2, tab 24 at 2; exs. A-9, A-10 at 343, ex. A-46 at 626-839; tr. 2/21-23, 26, 44-45, 118-121, 133-35, 148-50) During this period, MAP performed very little work on the PO (R4, tab 24 at 7-39).

26. On 26 November 2013, the government orally notified appellant informally that the government was in the process of cancelling the PO and a modification to that effect was in process (R4, tab 20; tr. 1/127-28).

27. On 6 December 2013, the contracting officer issued Modification No. P00001 cancelling the PO (R4, tab 2).

28. On 28 September 2016, appellant filed a certified claim asserting damages of $134,553, including anticipatory profit, alleging that the PO was improperly

6

cancelled and the government breached its duty of good faith and fair dealing in doing so. MAP further asserted that the duct assemblies were substantially complete at the time of the PO's cancellation. (R4, tab 24)

29. The claim was denied by a contracting officer's final decision dated 23 November 2016 (R4, tab 25), from which this timely appeal was filed by letter dated 28 November 2016.

## DECISION

Appellant contends that the government improperly cancelled the PO and in so doing breached its duty of good faith and fair dealing. In particular, it alleges that the government failed to evaluate MAP's offer to cure the alleged defects. MAP asserts it was entitled to a reasonable time beyond the contract delivery date to correct what it considered were "minor" defects in its supplies.

Although all of appellant's arguments have not been expressly addressed in this decision, they have been considered in reaching the conclusions herein. None of MAP's contentions provides a basis to sustain the appeal. Moreover, inasmuch as the appeal is denied because appellant has failed to establish that it is entitled to recover, issues regarding quantum are not reached.

"A unilateral purchase order is an offer by the Government which a contractor can accept by delivering the requested supplies in accordance with the terms and conditions specified in the order." *Alsace Industrial, Inc.*, ASBCA No. 51709, 99-1 BCA ¶ 30,227 at 149,542. Moreover, complete performance, rather than substantial performance, is required. "If complete performance in accordance with the terms and conditions is not tendered, the Government's offer lapses by its own terms, rendering the purchase order incapable of being accepted by a contractor." *Id.* An offeree's absence of performance or defective performance operates as non-occurrence of the "condition." RESTATEMENT (SECOND) OF CONTRACTS §§ 37 cmt. b, 224 cmt. c; 3 ERIC M. HOLMES, CORBIN ON CONTRACTS § 11.1 n.14 (rev. 1996). Generally, when the parties have made an event a "condition" of their agreement, **there is no mitigating standard of materiality or substantiality** which is applicable to non-occurrence of that event. RESTATEMENT (SECOND) OF CONTRACTS § 237 cmt. d.; *Comptech Corp.*, ASBCA No. 55526, 08-2 BCA ¶ 33,982 at 168,083 (emphasis added). Once the offer has lapsed, the government is not liable to the contractor for any costs it incurred in attempting to perform in full. "When an offer lapses by its terms, the offeree (supplier) bears the costs of nonperformance." *TTF, L.L.C.*, ASBCA Nos. 58495, 58516, 13 BCA ¶ 35,403 at 173,696. Thus, if the supplies delivered by the contractor pursuant to a unilateral PO do not comply with the PO requirements, the contractor has failed to perform and the contract lapses.

7

"[I]t is well established that the government has the right to insist on 'strict compliance' with its specifications." *Comptech*, 08-2 BCA ¶ 33,982 at 168,085; *see also Cascade Pacific Int'l v. United States*, 773 F.2d 287, 291 (Fed. Cir. 1985) ("The government, just as any other party, is entitled to receive that for which it contracted and has the right to accept only goods that conform to the specification."). The government here contracted for the delivery of eight duct assemblies. The government also expressly required duct assemblies held together with a specific type of lock bolt, the BACB30DX, not the superseded BACB30AL lock bolt. The PO required parts with traceability to the manufacturer and manufactured using new material rather than "used, reconditioned, remanufactured, or new/unused government surplus" material. MAP never obtained authorization from the contracting officer to use other than new material. The government was entitled to receive duct assemblies which complied with all of these requirements. If the duct assemblies delivered by MAP failed to meet any of these requirements the government properly could reject them.

Here, appellant failed to deliver the specified supplies by the due date. Ultimately, MAP later tendered only four of the eight duct assemblies required by the PO. Moreover, the four duct assemblies that were submitted for inspection by MAP were defective in multiple respects. The duct assemblies included the superseded BACB30AL lock bolts. In addition, the duct assemblies incorporated commercial surplus lock bolts and flanges without sufficient traceability to the manufacturers of the components. Finally, MAP agreed to provide new material rather than "used, reconditioned, remanufactured, or new/unused Government surplus" material, MAP submitted lock bolts that were over 50 years old and rivets that were certified as "surplus parts, used, repaired, or reconditioned" rather than "new."

Appellant's contentions, in particular those alleging government bad faith, must be evaluated in the context of these multiple failures to comply with contractual requirements. MAP, *inter alia,* contends that the failures were relatively "minor" and either should have been waived or MAP should have been provided an opportunity to make corrections, including replacing the bolts. Appellant asserts that the government's failures to waive late delivery and allegedly "minor" non-compliances of the four tendered assemblies and permit purportedly "minor" corrections, evidence government bad faith and failure to fulfill its contractual duty of good faith and fair dealing. MAP's prior experiences with government leniency and issues related to conditional approval of first articles under prior contracts are inapt. The PO required fully compliant production quantities. The air duct assemblies were not first articles. Moreover, the merits of multifarious and unique circumstances of prior contract provisions/requirements and disputes with various government personnel and procuring entities involving primarily the adequacy of first articles, wholly fail to support its allegations of bad faith in the administration of the instant PO. Here, the government simply and properly enforced its rights under the solicitation. "The implied duty of good faith and fair dealing cannot expand a party's contractual duties

beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010); *see also Century Exploration New Orleans, LLC v. United States*, 745 F.3d 1168, 1179 (Fed. Cir. 2014) ("Appellants cannot rely on the implied covenant of good faith and fair dealing to change the text of their contractual obligations."); 13 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 63:22 (4th ed. 2000) ("As a general principle, there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract.").

With regard to the lock bolts, the specification prohibition of BACB30AL lock bolts was not ambiguous. MAP's own employees and supplier recognized and informed Mr. Marin of the prohibition. Appellant's rather circuitous contentions regarding its asserted right to use an "equal," misinterpret the solicitation and are irrelevant in any event because appellant did not use an "equal." Instead, it provided the superseded BACB30AL bolt. The BACB30DX not only superseded the BACB30AL bolt but it represented a significant "improvement" that the government was entitled to receive.

The lock bolts and flanges also did not satisfy the extensive solicitation requirements regarding traceability of the component parts to the manufacturer. The traceability provisions were not merely "paperwork" exercises but were designed to insure in part that counterfeit items were not being provided. Overseas-sourced components, used by MAP in the air duct assemblies, were reasonably a particular concern. Further, as recognized in *DCX-CHOL Enterprises, Inc.*, ASBCA No. 54707, 08-2 BCA ¶ 33,889 at 167,728, traceability requirements are included in procurements for critical application items, like the duct assemblies to be installed in the fuselage of FC-135 military aircraft here, because "Critical application items frequently must carry with them the assurance of superior quality and reliability." As the Board noted in *DCX*, inserting traceability requirements into the order ensured that "respondent paid a premium price for connectors that had been subjected to a rigorous testing regimen and had been found to be 'the highest grade.'" *Id.* It was MAP's duty to retain sufficient traceability documentation and, to the extent any other evidence of traceability ever existed, MAP has failed to fulfill its duty.

MAP asserts that none of the four traceability clauses in the solicitation/order applies because they apply only to the end item – the ducts themselves – and not their components. Thus, MAP maintains, as long as it manufactured, i.e., assembled, the ducts, it does not need to prove that the components it used are traceable to the designated manufacturers. However, MAP's interpretation runs afoul of the language in the contract, its own contemporaneous interpretation, established ASBCA law, and the primary purpose of the traceability requirements generally.

9

Title 41 of the United States Code defines "items" and "supplies" for purposes of Federal procurement. 41 U.S.C. § 1081 states that:

> [T]he terms "item" and "item of supply" –
>
> (1) mean an individual part, component, subassembly, assembly, or subsystem integral to a major system, and other property which may be replaced during the service life of the system, including spare parts and replenishment spare parts; but
> (2) do not include packaging or labeling associated with shipment or identification of an item.

41 U.S.C. § 115 states that "the term 'supplies' has the same meaning as the terms 'item' and 'item of supply.'"

Thus, Congress has made clear that "items" and "supplies" include individual parts, components, subassemblies, assemblies, and subsystems of a major system, as well as any other property that may be replaced in a system. Only the packaging and labeling associated with an item are excluded. In addition, 41 U.S.C. § 105 explains that "the term 'component' means an item supplied to the Federal Government as part of an end item or of another component." Thus, Congress specifically differentiated between an "item" and an "end item," meaning that (1) the definition of item is broader than just the particular end item purchased (in this case, the duct assemblies) and (2) items are "part of an end item." The components here (the bolts, flanges, and rivets) were part of the end item duct assembly. In short, the United States Code defines "items" and "supplies" as anything and everything the contractor provides to the government pursuant to a procurement, other than packaging or labeling. In *DCX*, 08-2 BCA ¶ 33,889, the Board concluded that traceability requirements extend to components of end items. *Id.* at 167,723. Additionally, during contract performance MAP consistently collected and maintained traceability information for most components contrary to its present contentions. Moreover, MAP's interpretation would render the traceability requirements largely meaningless and ineffective. Their primary purpose is to ensure that authentic material is installed on the aircraft. Under MAP's interpretation, the government would only be able to ensure it is receiving authentic components (*e.g.* fasteners and flanges) when it is purchasing that particular end item. The government would not be able to ensure manufacturing provenance and genuineness purchasing those same components when they are included in a higher-level part or assembly.

MAP also quoted that it would submit new material and that it would not provide material which was "Used, Reconditioned, Remanufactured, or New/Unused

Government Surplus." MAP, however, did not exclusively provide new material in its duct assemblies. The surplus rivets were used, repaired, or reconditioned surplus parts. MAP has not introduced evidence regarding the condition of the rivets at the time it received them. These parts have not been established as "new."

Further, in addition to the noncompliance of the BACB30AL lock bolts with the solicitation specification and traceability requirements, the BACB30AL specification was discontinued for procurement on 1 May 1963. If the MAP bolts were authentic, they likely were at least 50 years old when MAP purchased them in July 2013. MAP did not introduce evidence regarding the condition of the bolts at the time it received them.

Finally, the record fails to establish that the deficiencies were "minor" or easily and expeditiously correctable. In this regard, appellant erroneously alleges that the government had extensive duties regarding the testing or analysis of the nonconforming components and further duties to assist MAP in establishing the ease of correcting deficiencies and traceability of the parts and the provenance of their manufacture. To the contrary, appellant bore the burden of proving compliance and traceability. If the known defects and traceability issues were as "minor" as alleged, appellant should have made corrections and sufficiently documented the provenance of the parts forthwith.

Even assuming *arguendo* that MAP's noncompliance were "minor" as it alleges, the delivery date for the four tendered items had passed. Therefore, corrections could not have been timely accomplished "within the required delivery schedule." *See* FAR 46.407(b). Whether the government revived the PO when it allowed MAP to tender four parts for inspection rather than withdrawing the PO is irrelevant. A revived PO has the same terms as the original PO. MAP delivered only four of the eight duct assemblies and the four assemblies tendered by MAP were deficient as detailed above. *Cf. Amplitronics, Inc.,* ASBCA No. 33732, 87-2 BCA ¶ 19,906.

For the aforementioned reasons the government properly cancelled the PO and appellant has failed to establish that the cancellation was done in bad faith. The appeal is denied.

Dated: 27 March 2017

ROBERT T. PEACOCK
Administrative Judge
Armed Services Board
of Contract Appeals

11

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60904, Appeal of Military Aircraft Parts, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

12